Charles A. WIGGINS and Ruth P. Wiggins d/b/a Sugar Ridge Lake Estates; Jack Stevenson, James M. Deady and Audrey C. Deady, Norris E. Sherman and Lois M. Sherman, Hubert A. Scheidler and Ruth G. Scheidler, Eugene D. Walters and Antoinette A. Walters, Daniel J. Sullivan, Jr., and Gail G. Sullivan, Wayne Karanovich and Martha G. Karanovich, Robert G. Trout and Marilyn L. Trout, Don E. Handlin, Carl R. Shepherd and Virginia L. Shepherd, Appellants,

v.

BRAZIL COAL AND CLAY CORPORATION, Appellee.

No. 883S315.

Supreme Court of Indiana.

Sept. 1, 1983.

Rehearing Denied Nov. 10, 1983.

Hansford C. Mann, Terre Haute, for appellants.

William M. Evans, Indianapolis, for amicus curiae Indiana Legal Foundation.

G. Daniel Kelley, Jr., Scott A. Smith, Indianapolis, for amicus curiae.

David W. Sullivan, Terre Haute, James B. Sparks, Bloomfield, for appellee.

## ON PETITION TO TRANSFER

DeBRULER, Justice.

In this case the owners of a strip pit in Clay County, Indiana sued a strip mining company for damages and an injunction for causing the loss of water from their strip pit. The trial judge made special findings of fact and entered his conclusions of law and final judgment in favor of the defendant coal stripping company. On appeal, the First District Court of Appeals at 440 N.E.2d 495 reversed and in so doing modified case law by adopting the Restatement of Torts provisions for determining the liability of users of ground water. Transfer is granted and the opinion of the Court of Appeals is vacated.

Appellants accept the accuracy of the trial judge's findings of fact. They are clear and straightforward and describe the nature of this case, and are stated as follows:

"1. Plaintiffs are owners of certain real estate situated in the North half of Section 9, Township 11 North, Range 6 West in Clay County, Indiana, upon which was located a fresh water lake of ten acres or more, hereinafter referred to as the 'lake.'

2. The lake was formed prior to 1960 as a result of a strip-mining coal operation. The lake was located South of Centerpoint Road which runs East and West, and East of a county road running North and South.

3. The Stevenson tract consisted of 75 acres at the Southeast quadrant of the intersection of the Centerpoint Road and the North-South road. This land contained approximately one-half of the lake. The Stevensons, at the time this

action began, owned an undivided one-half interest in this 75 acres.

4. The eastern one-half (approximately) of the lake lies on a tract of land consisting of 121 acres purchased by plaintiffs Charles A. Wiggins and Ruth P. Wiggins, husband and wife, in April of 1962, from the mining company that created the lake bed. Mr. and Mrs. Wiggins called their property 'Sugar Ridge Lake Estates,' and hereinafter said property will be referred to as 'Sugar Ridge Lake Estates'.

5. The 'Stevenson tract' was composed mainly of spoil bank land, the West half of the lake, and some undisturbed land.

6. Sugar Ridge Lake Estates in April, 1962, consisted of spoil bank land, the East half of the lake, and a number of small ponds.

7. The lake bed was divided by a 'haul road' created by the strip-mining company which was located approximately 15 feet East of the East line of the Stevenson tract, and created a dam of sorts between the two halves of the lake.

8. The lake was not fed by any stream of water, but, instead, was dependent upon percolating and surface waters. The lake was formed slowly and continuously over the years from approximately 1960 until September 1977. In April of 1962, there was approximately 20 to 25 feet of water at the deepest point in the eastern half of the lake, which brought the surface of the lake within three feet of the top of the 'haul road.' In September, 1977, the water surface had reached a level approximately 15 feet higher than the 'haul road.'

9. Between April, 1962, and approximately 1970, Mr. and Mrs. Wiggins used Sugar Ridge Estates for their private enjoyment and made many improvements thereon. In 1970 through 1973, Mr. Wiggins used the lake for catfish farming, and raised thousands of catfish for marketing. He also, during this time, opened the lake to the public for use as a fishing lake for a daily fee.

10. In 1975, Mr. Wiggins closed his catfish farm, closed the lake to the public, and began to develop Sugar Ridge Lake Estates as a subdivision for recreational, residential and retirement homes.

11. Each Plaintiff, other than Jack Stevenson, Charles A. and Ruth P. Wiggins, had purchased lots from Plaintiff Wiggins in Sugar Ridge Estates and owned interests in the East half of said lake.

12. Defendant, Brazil Coal and Clay Corporation, is a surface mining company which began a coal mining operation near Center Point, Indiana in 1975.

13. At the time the controversy arose in 1977, the defendant, a foreign corporation, was strip-mining coal north of the Centerpoint Road and west of the North-South road. It was not a lessee of any ground owned by plaintiffs. Its mining was being conducted by stripping 90 feet wide pits running in a North and South direction and proceeding strip by strip from West to East. Each strip mined required about 30 days to complete.

14. In a surface mining operation such as defendant's, a dragline digs down to the level of the coal seam so that other mining equipment can remove the coal from the pit. The presence of water in the pit creates problems in such operations and can stop the mining operation if not removed.

15. During August of 1977 while the defendant's dragline was digging at a depth of 50–55 feet, substantial amounts of water rushed into the bottom of the mining pit from below, flooding the pit. The dragline was moved approximately 100 feet north and began digging again. Once again, water began rushing into the bottom of the pit, flooding the pit.

16. The defendant then moved its strip-mining equipment approximately 500 feet to the North and continued its stripping without any interference from excess water.

17. In March of 1976, a substantial length of pit had similarly flooded, causing the mining operation to be shut

down for three weeks. Mining could not resume until the pit was dewatered.

18. When the two pits flooded in August of 1977, it was necessary to dewater those pits before the dragline returned to the area on the next cut. If not, the water in those pits would flood the newly dug pit which would be dug along side it. More than three-quarters of a mile of that pit could have flooded. So, during the time the strip to the north was being completed, and the next back to the south was progressing, the defendant drilled two wells east of the North-South road and north of the Centerpoint Road and by pumping from these well sites, was able to lower the water in the pit. In addition to dewatering the flooded pits, the continued pumping from the wells was to eliminate the possibility of again encountering excessive water in the pit.

19. As the defendant was dewatering its pits by pumping water from the pits, it was discovered that the water level of the plaintiffs' strip lake was falling. It was determined that the water flooding defendant's pit was coming from plaintiffs' strip lake by way of old deep mine shafts or otherwise beneath the upper vein of coal. The dewatering of defendant's pits resulted in the emptying of plaintiffs' strip lake because the water flooding defendant's pit was coming from plaintiffs' strip lake.

20. The defendant's mine area is heavily undermined by underground mines. There are two veins of coal in the area. The underground mines were generally in the lower vein coal. The defendant's mining was generally in the upper vein.

21. Before its mining began, the defendant obtained maps of the deep underground mines in their mining area. No maps which they obtained showed any deep mines under the plaintiffs' strip lake. There were deep mines under plaintiffs' strip lake.

22. The water flooding defendant's pit in August of 1977 was coming from plaintiffs' strip lake by way of deep mine shafts and laterals or otherwise. It was

and is impossible to determine the path the water was taking from plaintiffs' lake to the deep mine workings below defendant's pits.

23. Before August of 1977 when the plaintiffs' water flooded defendant's pits, the defendant, or its employees, had no knowledge of any connection between plaintiffs' strip lake and defendant's mine. Such a connection could not be seen from the surface of the ground and maps of the area did not disclose the connection.

24. In at least portions of each pit cut by Defendants, the lower vein seam of coal had been mined and there existed the lower deep mine shafts and workings. Defendant placed pumps in these portions of each pit to dewater the lower deep mine shafts.

25. It was necessary, in order to continue with Defendant's mining operation, to remove the water from the lower deep mine shafts and the pumps placed in the wells were used to dewater the lower deep mine shafts so that the water therein would not come into the pits cut above them. It was in this process of dewatering the old lower deep mine shafts that the water was drained from Plaintiffs' lake. At this time, in August of 1977 it was necessary and reasonable to remove this water to continue the Defendant's mining operation. The evidence was uncontroverted that there was no alternative or option available to Defendants if they were to continue with the mining operation.

26. The defendant conducted its mining operation on its own property in a reasonable, necessary and lawful manner for the benefit and improvement of defendant's property.

27. The Defendant's use or removal of water from its property was for the reasonable and beneficial use of the land in connection with its enjoyment of the land and for the ordinary purposes of mining and improving the land."

The judge thereupon concluded that the strip mining company dealt with the water

in a manner which was reasonably necessary for some beneficial purpose relating to the land and that the pumping and removal of the water from its mining operations was both reasonable and necessary.

It is appellants' legal position that the judgment of the trial court should be reversed because it rests upon erroneous conclusion. The essence of this contention is that the trial court did not recognize the property of the appellants in the water. In support of this contention appellants cite Indiana cases, Indiana statutes relating to water resources, the Surface Mining Control and Reclamation Act of 1977, and the Restatement of Torts Second, Section 858. The statutes cited do not directly govern the issue presented. They are presented as persuasive matter. They are intended to persuade this tribunal that the public policy of the State is moving in the direction of recognizing that property in water should not be absolute in the owner of land where it is found. This is a proper usage in appellate advocacy. The consideration given these enactments by the First District Court of Appeals has precipitated a brief of Amicus Curiae, the purpose of which is to facilitate this Court in making a proper construction and application of the statutes. In light of their aforementioned use in this appeal, we have no cause to undertake that task here.

According to the findings, the coal company dug down into its land to a depth of fifty feet. Water began to flood the excavation. The source of this water was appellants' strip pit. The water was moving through natural and artificial fissures and orifices beneath appellants' impoundment and the public roadways which separated the tracts, and thus into the new pit. The exact course of these passages was not determined. The coal company sunk wells, again on its land, to an even greater depth, and pumped the water out and into a ditch, and in this manner intercepted it and dewatered its pit. Appellants' strip pit was drained in the process. There is no indication in the findings that the water table was implicated or that the water which collected was freely flowing on the surface or through a watercourse.

Appellants first contend that the trial court erred in looking to the needs of the coal company business as its guideline. In so doing they rely upon Valparaiso City Water Company v. Dickover, (1896) 17 Ind. App. 233, 46 N.E. 591. There the City and Dickover owned land bordering on a natural lake. The City pumped water from the lake in a dry season so as to cause the water to recede far out into the lake, rendering the beaches useless. The court held that the property of the City in the lake water was a limited riparian right, and that the City should respond in damages for the diversion of an unreasonable quantity of the water. Here the parties are not owners on the same body of water, and thus the rule of the case is not applicable here.

Appellants also cite Enos Coal Mining Co. v. Schuchart, (1962) 243 Ind. 692, 188 N.E.2d 406. There, Schuchart's home was damaged by vibrations from blasting at a coal mine company nearby strip pit. The basis of this case is that the vibrations entered upon and invaded the Schuchart land and that this constituted a trespass under the law. In the present case, there is no indication in the findings at all that appellants' land was invaded by vibrations or forces from construction taking place, and that such vibrations cracked the bed or walls of appellants' pit, or rendered their ground more porous, thereby altering its water retaining capacity. In the absence of a finding of this character the case does not support the liability of the appellee coal company.

The general rule governing property in ground water found early expression in The New Albany and Salem Railroad Company v. Peterson, (1860) 14 Ind. 112. There the railroad dug down into its right of way in constructing a railroad bed and in so doing diverted underground spring water from a well on a nearby lot, causing it to drain and dry up. This Court held that the injury to the well owner was not compensable, such conclusion being reached upon the basis that the property right of the railroad ex-

tended to digging in its ground and applying what was found there to its own purpose, and that its diversion of water involved no invasion of the property rights of the well owner. The Court did however take the time to set out in the opinion the fact that the damage was caused by the construction of the railroad bed, that the construction was being done in the usual and proper manner, and that there was no unnecessary damage.

In the *City of Greencastle v. Hazelett,* (1864) 23 Ind. 186, the plaintiff owned a spring. He sued in equity to restrain the city from using its adjoining land for a cemetery upon the claim that such use would adversely effect his water supply. This Court reversed an injunction order against the city, holding that the law governing rivers and flowing springs did not apply. The principle which did apply was the one which "gives to the owner of the land whatever is found below the surface, whether rock, or minerals, or earth, or water; and that he may dig and apply to his own use whatever he finds there, because it is his absolute property."

In *Taylor, Admr. v. Fickas,* (1878) 64 Ind. 167, recently relied upon by this Court in *Argyelan v. Haviland,* (1982) Ind., 435 N.E.2d 973, this Court held that an owner may repeal surface water and so utilize his land so as to throw such water back upon higher land, so long as it is not passing through a natural channel or watercourse. In so holding the Court stated:

> "The property in the lost water that percolates the soil below the surface of the earth, in hidden recesses, without a known channel or course, and property in the wild water that lies upon the surface of the earth, or temporarily flows over it as the natural or artificial elevations or depressions may guide or invite it, but without a channel, and which may be caused by the falling of rain or the melting of snow and ice, or the rising of contiguous streams or rivers, fall within the maxim that a man's land extends to the centre of the earth below the surface, and to the skies above, and are absolute

in the owner of the land, as being part of the land itself." 64 Ind. at 172.

While the case dealt with flooding surface waters passing over bottom lands, it does contain a definition of water which appears to aptly describe the situation encountered by the court in *New Albany and Salem Railroad Company v. Peterson, supra;* and *City of Greencastle v. Hazelett, supra.* They deal with "lost water that percolates the soil below the surface of the earth, in hidden recesses, without a known channel or course." Such water is part of the land upon which it is found.

In *Gagnon v. French Lick Springs Hotel Co.,* (1904) 163 Ind. 687, 72 N.E. 849, this Court considered a diversion of water from natural flowing springs which "had for more than thirty years been known throughout the United States" as issuing forth water "possessing healing and medicinal properties in a high degree." The loss of the water threatened the welfare of many persons who visited the springs. The owner of land near the springs, in diverting the water by pumping it from wells on his land and discharging it into a creek, was carrying out a deliberate scheme to force the hotel company to buy him out. The trial court had issued a temporary injunction against the diversion. This Court affirmed. This Court was quite apparently outraged at the deliberate plan to injure others and thereby coerce a buy out. In justifying the affirmance the Court observed that an early doctrine recognized the right of a landowner to exercise unlimited and irresponsible control of ground waters, without regard to injuries to nearby lands. The Court then put itself in stride with later decisions modifying this harsh doctrine. As we see it this part of the reasoning was unnecessary, as the *Gagnon* decision is actually within law governing property in water as that law had been previously applied in Indiana.

Water which percolates away underground through porous earth from beneath one lot to surrounding lands, no longer belongs to the owner of the lot. Such water is regarded as lost water and is con-

sidered at any given time to be part of the land with which it mingles. *Taylor, Admr. v. Fickas, supra.* When an owner takes hold of his lands, putting them to his own special uses, and altering them to his own purposes, he necessarily works a change in circumstances, even an injury, upon adjoining and neighboring lands. In recognition of this fact, the property in lost waters is cast and enforced by courts in a manner which recognizes that some of these injuries are the necessary result of proper and legitimate utilization of land while others are not. If the exercise of dominion over water in a subterranean stream dries a nearby spring, and results in waste of water and inflicts injury without furthering the enjoyment of the interceptor's land, a court may restrain the use. *Gagnon, et al. v. French Lick Springs Hotel Co., supra.* Similar damage to a nearby well resulting from construction being prosecuted in a usual and proper manner could not be stopped. *New Albany and Salem Railroad Co. v. Peterson, supra.* A court could act where an owner collected surface water and disgorged it in a concentrated or polluted form upon a servient lot thereby causing injury. *Argyelan v. Haviland, supra; Central Indiana Coal Co., Inc. v. Goodman,* (1942) 111 Ind.App. 480, 39 N.E.2d 484. Similarly in a related area, a landowner may not excavate so as to withdraw lateral support from adjoining lands in their natural state. *Spall v. Janota,* (1980) Ind.App., 406 N.E.2d 378. We, therefore, conclude that the law governing property in ground water applies in the case on appeal. Ground water is part of the land in which it is present and belongs to the owner of that land. It may be put to use to the fullest extent to further enjoyment of the land, however this right does not extend to causing injury gratuitously or maliciously to nearby lands and their owners.

There is a natural law of percolation which ordains that a liquid will pass through a porous substance. Plaintiffs' strip pit was originally located and dug into the earth for the purpose of reaching and taking out a coal strata beneath the surface of the earth. The site was not chosen because of the non-porous nature of the ground. It was not designed and built for the purpose of impounding and holding water. While it did hold water for some years, the property and tendency of the amassed water in the pit to seep and percolate to adjoining lands was nevertheless always present. When, then, defendant made its excavation deep into the ground on its nearby land to strip mine coal, the water from plaintiffs' strip pit seeped and leaked into the new excavation through holes in the earth in obedience to the natural law of percolation. Defendant's excavation did not alter the character of the earth beneath and surrounding plaintiffs' strip pit. It did not render plaintiffs' land porous. There was no physical invasion of plaintiffs' land.

There is no evidence that defendant's strip mining work was being done with a purpose or intent to injure plaintiffs. The excavation was being prosecuted in accordance with standard procedures. The water was being pumped from the wells for the singular purpose of preventing the water already percolating through and invading defendant's land from reaching and flooding the new pit, and preventing the taking of the coal. This the trial court held to be a beneficial use of the water in connection with the land. The loss of water from appellants' strip pit was not part of a scheme to bring about injury and was not merely gratuitous. On the basis urged the conclusion of law arrived at by the trial judge was not contrary to law. There is nothing in the circumstances of this particular case which persuades us to consider modifying the common law governing property in ground water.

Judgment affirmed.

GIVAN, C.J., and PRENTICE and PIVARNIK, JJ., concur.

HUNTER, J., dissents with opinion.

HUNTER, Justice, dissenting.

I must respectfully dissent to the majority opinion. Although I would grant trans-

fer in order to clarify the Court of Appeals' holding on preemption, I would adopt its ruling that Section 858 of the Restatement (Second) of Torts is to be applied when determining liability for the use of ground water.

The Court of Appeals' determination that the Federal Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201–1328 (1976, Supp. III), applies to the present case and preempts Indiana's common law rule on subterranean water rights should be clarified. In reaching its decision, the court overlooked the fact that the federal law was not in effect at the time the plaintiffs' cause of action arose. The Act did not become effective until May 3, 1978. 30 U.S.C. § 1252(c) (1976, Supp. III). Also, the effective interim portion of the Act did not include Section 1307,[1] which the Court of Appeals invoked. *Wiggins v. Brazil Coal and Clay Corp.,* (1982) Ind.App., 440 N.E.2d 495, 498–99. Additionally, the language in the federal Surface Mining Act indicates that Congress did not intend to occupy the field and thereby did not preclude state law. *See* 30 U.S.C. §§ 1253, 1255 (1976, Supp. III); *Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc.,* (1981) 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1. There is justification, however, in the Court of Appeals' decision that Indiana's common law contradicts the intent of the federal law, which the supremacy clause does not allow.

In *Hodel,* the Supreme Court determined that, pursuant to the commerce clause of the United States Constitution, Congress could regulate surface coal mining and that state law determinations conflicting with the federal law would be preempted. 452 U.S. at 290–91, 101 S.Ct. at 2367, 69 L.Ed. at 24–25. The rule applied by the majority does conflict with the congressional intent of the Surface Mining Act. Congress intended to protect the public and the environment from damages resulting from surface mining. 30 U.S.C. § 1201(c); *Hodel,* 452 U.S. at 277, 101 S.Ct. at 2360–61, 69 L.Ed.2d at 16–17. Consequently, Section 1307 provided a remedy for the damage plaintiffs have suffered. The majority, by relying on Indiana's common law, denies the plaintiffs any remedy. Thus, although the federal law could not have preempted Indiana law at the time this cause arose, the majority's holding now conflicts with the congressional intent regarding surface mining operations and conflicts with current Indiana law. *See* Ind.Code § 13–4.1–8–1 (Burns 1982 Supp.). Because of this conflict and for the following reasons, I dissent from the majority's adherence to Indiana's common law rule.

The majority steadfastly clings to the rule that ground water belongs to the owner of the land under which it flows and that it may be used as the owner wishes despite injury to neighboring owners of ground water, unless the injury is caused "gratuitously or maliciously". *Majority opinion.* The majority rationalizes its conclusion by noting that defendant's strip mining operation did not alter the character of the earth beneath and surrounding plaintiffs' lake, that defendant used standard mining procedures, and that defendant did not intend to injure plaintiffs. What the majority ignores, is that by denying plaintiffs any remedy, plaintiffs are forced to bear the cost of defendant's coal operation. This result is against the congressional intent of the federal Surface Mining Act, against the express provision of the Indiana Surface Mining Act, and against traditional property and tort theory. The majority dismisses any consideration of current statutes or public policy, however, and invokes a rule

---

1. Section 501 of the Surface Mining Act, 30 U.S.C. § 1251 (1976, Supp. III), established a two-tier regulatory scheme for surface mining operations. The first tier was an interim phase that mandated federal enforcement of some of the Act's provisions. These provisions were specified in 30 U.S.C. § 1252(c) and did not include § 1307. The second phase, or perma-nent phase, required the states to adopt a regulatory program that complied with all of the federal performance standards. 30 U.S.C. § 1253 (1976, Supp. III). *See Hodel v. Virginia Surface Mining & Reclamation Assoc., Inc.,* (1981) 452 U.S. 264, 269–71, 101 S.Ct. 2352, 2356–57, 69 L.Ed.2d 1, 11–13.

over a century old without discussing why it is applicable today.

As the Court of Appeals noted, the common law rule on ground water was formulated to relieve courts of the responsibility of decision making during an era when there was little scientific knowledge regarding hydrology. *Wiggins v. Brazil Coal and Clay Corp.*, (1982) Ind.App., 440 N.E.2d 495, 499. *See also State v. Michels Pipeline Construction Co.*, (1974) 63 Wis.2d 278, 217 N.W.2d 339. This rationale no longer applies. Also, the development of modern society has diminished the theory of absolute ownership of property, which is the basis for the rule. Today a landowner is subject to numerous laws and regulations concerning his property, including "conservation, nuisance, flood control, zoning, and pollution control laws". *Wiggins*, 440 N.E.2d at 499. Thus the theory of absolute ownership of percolating ground water conflicts with our modern views on property.

Furthermore, no other form of property enjoys the same degree of immunity from liability as does subterranean water rights. This immunity differs from our law on riparian rights to surface water and subterranean streams. The standard of reasonableness applied by the majority to percolating ground water looks only to whether the use is in excess of the reasonable and beneficial needs of the appropriator. Riparian water rights, on the other hand, are measured by the needs of *all* owners of the water. This Court has held:

> "Each riparian proprietor is entitled to a reasonable use of water for purposes not domestic. The question whether the quantity which he is diverting is reasonable is not to be determined, in a case like this, by the requirement of his business, but rather by determining whether his use is reasonable and apportionate with reference to the quantity of water usually in the stream or body of water, and whether the complaining riparian owner is substantially damaged by being deprived of his reasonable use. If the business require [sic] and use [sic] more water than can be permanently diverted without injury to the right of another riparian proprietor, he has a cause of action. The necessities of one proprietor's business cannot be taken as the standard of another's rights in the water which have a right to use to a reasonable extent."

*Valparaiso City Water Co. v. Dickover*, (1896) 17 Ind.App. 233, 237–38, 46 N.E. 591, 592. I agree with the Court of Appeals that there is no logical reason to distinguish percolating ground water from any other form of water.

Nor is there any reason to distinguish the rule governing percolating ground water from other common law theories of property. Our nuisance law recognizes a right of action to recover damages for the interference with the use and enjoyment of property. Ind.Code § 34–1–52–1 (Burns 1973); *Muehlman v. Keilman*, (1971) 257 Ind. 100, 272 N.E.2d 591; *Indiana Motorcycle Ass'n v. Hudson*, (1980) Ind.App., 399 N.E.2d 775; *Yeager & Sullivan, Inc. v. O'Neill*, (1975) 163 Ind.App. 466, 324 N.E.2d 846. Under our nuisance law, like our riparian water rights law, we look to both parties to determine if circumstances justify shifting the loss from the victim to the party responsible for the interference with the use and enjoyment of the victim's property. *See Argyelan v. Haviland*, (1982) Ind., 435 N.E.2d 973, 989 (Hunter, J., dissenting); *Muehlman*, 257 Ind. at 108–09, 272 N.E.2d at 596. As our nuisance statute and case law indicate, property owners in Indiana are subject to the maxim *sic utere tuo ut alienum non laedas* (so use your property as not to injure the rights of another). *Indiana Motorcycle Ass'n*, 399 N.E.2d at 778; *Albright v. Crim*, (1933) 97 Ind.App. 388, 185 N.E. 304. It is time we applied this maxim to subterranean percolating water as well, rather than invoking an outdated rule that no longer serves a purpose.

The nature of the common law is to evolve to reflect changing times and circumstances. It is a court's duty to effectuate this change when necessary. As this Court stated in *Brooks v. Robinson*, (1972) 259 Ind. 16, 22–23, 284 N.E.2d 794, 797:

"Judicial devotion to the doctrine of *stare decisis* is indeed a justifiable concept to be followed by our courts. However, it cannot and must not be so strictly pursued to the point where our view is opaqued and reality disregarded. To do so is to envision the common law to be as immutable as the laws of the Medes and Persians, and thus render our system of jurisprudence forever impotent. The strength and genius of the common law lies in its ability to adapt to the changing needs of the society it governs."

A departure from *stare decisis* is necessary when the rationale for the original rule no longer exists. There is no longer any justifiable reason to distinguish percolating ground water from our other property concepts and, as evidenced by the facts of this case, to do so is manifestly inequitable.

An additional factor in this case is the conflict between the majority's holding and the federal and state legislative policy regarding surface mining operations. As required by the federal Surface Mining Act, Indiana has adopted the language of 30 U.S.C. § 1307 concerning water rights and replacements. Ind.Code § 13–4.1–8–1(25) (Burns 1982 Supp.) provides:

"[A permittee shall] Replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source if that water supply is affected by contamination, diminution, or interruption proximately resulting from his surface coal mining and reclamation operation. However, this does not affect the right of that person to enforce or protect his interest in the water by other means allowable under the law."

Although this statute was not in effect at the time defendant was pumping plaintiffs' lake dry, the statute does demonstrate both the state and federal legislatures' intent to provide a remedy to those persons injured by a surface mining operation. This remedy reflects the principle that innocent parties should not bear the cost of another's business operation. If the same action were taken today, defendant could not escape liability even under the majority's rule because Ind.Code § 13–4.1–8–1(25) would provide plaintiffs a remedy. It is inequitable to allow defendant to escape liability based on an outdated common law rule that conflicts with our legislative policy. Therefore, I would follow the Court of Appeals' course and adopt Section 858 of the Restatement (Second) of Torts.

The adoption of this Section would not only accommodate the legislative policy concerning surface mining operations, but also would bring the law of subterranean water rights in line with riparian principles. *See* Restatement (Second) of Torts, § 858, Comment *d*. Section 858 provides:

"(1) A proprietor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless

"(a) the withdrawal of ground water unreasonably causes harm to a proprietor of neighboring land through lowering the water table or reducing artesian pressure,

"(b) the withdrawal of ground water exceeds the proprietor's reasonable share of the annual supply or total store of ground water, or

"(c) the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water."

Thus, as in our nuisance and riparian water rights laws, the rights of all property owners are considered.

Here the trial court found that defendant's use of the water was reasonable and necessary for the benefit of defendant's property. However, the harm caused to plaintiffs cannot be labeled reasonable. Plaintiffs lost the use and enjoyment of their lake. Furthermore, Findings 18, 19, and 22 of the trial court reveal that defendant continued to pump water *after* the pits were dewatered even though it was *known* that the pumps were causing the water level of plaintiffs' lake to drop. Defendant

took no action to alleviate the situation but continued to pump water "to eliminate the *possibility* of again encountering excessive water in the pit". (Emphasis added). Based on these findings, defendant should be liable for the unreasonable harm it caused to plaintiffs' property.

Defendant argues that the adoption of Section 858 amounts to judicial legislation and would unfairly punish the company for relying on Indiana common law. What defendant essentially argues is that plaintiffs should be made to suffer the loss of the use and enjoyment of their lake so that defendant may carry on its business as usual. Justice should not allow this result. As the Court of Appeals stated:

> "Equity demands a departure from *stare decisis* and the traditional common law rules. We have no doubt that it was necessary for Brazil Coal to dewater its pits in order to mine coal. However, a principle of modern law is that a business should bear its own costs, burdens, and expenses of its operation because they can be distributed to the consumer through the price mechanism. *Enos Coal Mining Co. v. Schuchart,* (1962) 243 Ind. 692, 188 N.E.2d 406. To hold otherwise, would result in a shifting of the cost back upon the innocent landowners."

*Wiggins,* 440 N.E.2d at 501. Furthermore, defendant knew, or should have known, of the federal Surface Mining Act, enacted August 3, 1977, which required states to adopt regulations mirroring the federal provisions. That Act, although not in effect at the time this cause arose, should have put defendant on notice that its action was not sanctioned.

Additionally, when the equities of this case are weighed, it is obvious defendant should absorb the cost of its action. The majority's adherence to the common law ignores these equity considerations, ignores our other property concepts, and ignores both federal legislative intent and Indiana's legislative policy. The adoption of Section 858 would accommodate all of these factors and bring Indiana's subterranean water rights in line with our riparian water rights

law and our nuisance statute and case law. Therefore, I dissent.

The Court of Appeals' decision should be vacated to clarify the preemption question, and this Court should adopt Section 858 of the Restatement (Second) of Torts, reverse the trial court and remand the cause of action.