**Robert PROHOSKY, et al.,
Plaintiffs-Appellees,**

v.

**The PRUDENTIAL INSURANCE
COMPANY OF AMERICA,
Defendant-Appellant.**

**No. 84–1699.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1985.

Decided July 22, 1985.

Wayne C. Ponader, Bose, McKinney & Evans, Indianapolis, Ind., for plaintiffs-appellees.

John R. Nesbitt, Rensselaer, Ind., for defendant-appellant.

Before ESCHBACH and COFFEY, Circuit Judges, and JAMESON, Senior District Judge.*

COFFEY, Circuit Judge.

The defendant-appellant, Prudential Insurance Company of America, appeals the entry of an injunction preventing it from discharging water through the endguns of a central pivot irrigation system. We reverse and remand this case to the district

---

* The Honorable William J. Jameson, Senior District Judge of the District of Montana, is sitting    by designation.

court with instructions to vacate the injunction and proceed with the damage portion of this litigation.

## I

The defendant, Prudential Insurance Company of America ("Prudential"), is a New Jersey corporation that owns approximately 23,000 acres of farmland, commonly known as the Fair Oaks Farm, located in the rural, northwest counties of Jasper and Newton, Indiana. Following purchase of the farmland in December 1979. Prudential installed a central pivot irrigation system, consisting of several mobile, water-spraying rigs designed to rotate in a circular pattern and irrigate approximately 8,000 acres of the farmland.[1] Prudential obtained water for this irrigation system by drilling wells into the bedrock aquifer underlying the Fair Oaks Farm. In October 1982, area landowners who obtained water for domestic and agricultural consumption from the same bedrock aquifer, filed a class action lawsuit in the United States District Court for the Northern District of Indiana, premising jurisdiction upon diversity of citizenship, *see* 28 U.S.C. § 1332 (1982). The plaintiffs claimed that:

> "in 1981 and 1982 the Defendant's unreasonable operation of irrigation systems and appropriation of water in excess of its reasonable and beneficial use on the Fair Oaks Farms caused a large number of water wells on lands situated in the neighborhood of the Fair Oaks Farms to become depleted depriving the Plaintiffs and others of water for domestic and agricultural consumption."

The plaintiffs alleged that Prudential's irrigation system depleted the water supply, and reduced the artesian pressure, of the bedrock aquifer underlying the Fair Oaks Farm and the surrounding land owned by the plaintiffs. The plaintiffs further alleged that "the water extracted from the depleted water table contains sulfur and other elements and chemical compounds which make the water odoriferous, untasteful and unfit for consumption." The plaintiffs also claimed that "[s]treamflows and lake levels that are dependent upon ground water discharge have been and will continue to be reduced as a direct and proximate result of operation of defendant's irrigation systems." In addition, the plaintiffs claimed that "depletion of the ground water resources underlying Jasper County, Indiana and Newton County, Indiana has decreased the productivity of the Plaintiff's real estate, diminished the desirability of residing upon said land, and has caused a depreciation in the value of the Plaintiff's land." The plaintiffs sought $50 million in compensatory damages, $50 million in exemplary and punitive damages, and requested that the "Defendant and those under the direction and control of Defendant, and those contracting with the Defendant, be enjoined from further irrigation upon said real estate."

In October 1983, the parties proceeded to trial on the issue of whether or not the plaintiffs were entitled to injunctive relief and, following a seven-day bench trial, the district court judge entered detailed findings of fact and conclusions of law. *See Prohosky v. Prudential Ins. Co. of America*, 584 F.Supp. 1337 (N.D.Ind.1984) (*"Prohosky"*). At trial, Prudential "admitted that its pumping lowers the static water level in the wells but ... maintained that these wells still contain water at artesian conditions." *Id.* at 1350.[2] The Indiana Department of Natural Resources agreed with Prudential as it "consistently found that no wells have gone dry [and] ... that no person who took steps to meet the departmental guidelines was without water." *Id.* Indeed, the district court found that in 1981, twenty-one of the sixty-two named plaintiffs "experienced problems in obtaining water" from their wells which were

---

1. The facts underlying Prudential's purchase of the Fair Oaks Farm from Merlin Karlock in December 1979 are set forth in *Coldwell Banker & Co. v. Karlock*, 686 F.2d 596, 597–99 (7th Cir.1982).

2. Artesian conditions are present when subterranean water is forced toward the surface by means of hydrostatic pressure.

drilled in the bedrock aquifer underlying their land as well as the Fair Oaks Farm. *Id.* at 1346.[3] According to the court, nine of these plaintiffs modified their water systems, either by drilling new wells or extending the depth of their existing wells, "and from that time forward experienced no further problems with respect to the availability of water." *Id.* In 1982, nineteen plaintiffs, including the twelve who did not modify their wells the previous year, experienced difficulty in obtaining water. The court found that fourteen of these plaintiffs "elected to take steps to modify their water systems, and they in turn obtained adequate supplies of water again and have had no further problems...." *Id.* In 1983, six plaintiffs, including the five who did not modify their wells the previous year, "experienced problems in obtaining water." *Id.* According to the court, "[o]f those persons, almost all who made the appropriate modifications to their water systems have experienced no further problems in obtaining water or have alternative sources of water, usually through wells in the surficial aquifer." *Id.* Thus, the district court found that "[a]lmost all of [the] persons [who] have modified their wells, or drilled new wells where modification was not possible now have water." *Id.* In addition, "[m]ost of these people received some reimbursement from Prudential for their water problems...." *Id.* In view of this evidence, the court concluded that the plaintiffs' claim "of wells 'going dry' does not present any basis for a finding for an injunction at this time." *Id.* at 1350.

The district court further found that for purposes of obtaining injunctive relief, the plaintiffs failed to introduce sufficient evidence to establish that Prudential's irrigation system increased the levels of hydrogen sulfide within the plaintiffs' water. According to the court, "[s]ome of the plaintiffs, but certainly not all of them, claimed that the amount of hydrogen sulfide in the water in the new wells that they drilled, or in the existing wells that they

modified, has increased since Prudential began pumping." *Id.* at 1347. The court noted that:

"[t]he burden of proving increased hydrogen sulfide claims ... falls upon the plaintiffs. The lack of chemical analysis to support the claim complicates the fulfillment of that burden since the evidence is limited solely to the subjective perceptions of the plaintiffs and those perceptions, as shown by the evidence, differ from person to person."

*Id.* at 1348. In view of the lack of substantial evidence to support the plaintiffs' allegations of increased hydrogen sulfide levels, the district court denied injunctive relief, simply stating that the plaintiffs' testimony "should be carefully presented and considered on the damage phase of this case." *Id.*

The court also found that for purposes of injunctive relief, the plaintiffs failed to introduce sufficient evidence to establish that Prudential's irrigation system damaged the surficial aquifer, consisting of area lakes and streams. The court found that:

"[i]n the aquifer system in Jasper and Newton Counties, there is typically a lower or bedrock aquifer and a surface or sand aquifer, separated by an aquitard. The aquitard is an essentially impermeable layer of clay which acts to prohibit an interconnection between the bedrock and surficial aquifer, at least within any period of time relative to the growing season. In the Iroquois Moraine area, the aquitard extends to the surface and there is no surficial aquifer."

*Id.* at 1349. The evidence revealed that "most of the plaintiffs ... live on the Iroquois Moraine, an area where the aquitard reaches to the surface and accordingly, there is no surficial aquifer." *Id.* Thus, the court ruled that the evidence introduced on the issue of a reduced water level in the surficial aquifer "is insufficient for the issuance of an injunction now." *Id.*

---

**3.** The district court mistakenly referred to 1982 as the year in which twenty-one plaintiffs had

difficulty in obtaining water, but a review of the record reveals that the year was actually 1981.

**390**

Finally, the district court found that "[t]hose plaintiffs who actually have crop yield [data] ... are unable to show any pattern which might indicate Prudential's pumpage has affected their crop yields." *Id.* The testimony of the plaintiffs' experts revealed that there are "only two plaintiffs who could have experienced lower crop yields. But these two plaintiffs do not claim any loss of crop yields." *Id.* at 1350. Based upon the plaintiffs' lack of evidence in support of their assertions of reduced crop yields, the court concluded that "[t]he evidence on this subject does not authorize the issuance of an injunction." *Id.* In sum, the district court ruled that "for purposes of either permanent or temporary injunction this court determines that the evidence on crop loss and water quality with the alleged resulting impact on real estate values is not sufficiently persuasive to cause this court to grant a general or massive injunction." *Id.* at 1351. Upon review of the record, we agree with the district court that for purposes of obtaining injunctive relief, the plaintiffs failed to establish that the water level within the bedrock aquifer had fallen below artesian conditions, that the hydrogen sulfide level had actually increased, that they were in any way affected by a decreased water level in the surficial aquifer, or that they had experienced crop losses, as a result of Prudential's irrigation system. Despite the plaintiffs' failure to introduce sufficient evidence to establish that Prudential's irrigation system was causing continual harm, the district court granted "very limited and specific temporary injunctive relief," enjoining Prudential from "[s]praying water from all endguns on all of the systems that are presently located east of a north-south line created by Indiana Highway 55...." *Id.*

The evidence introduced at trial revealed that the central pivot irrigation rigs used by Prudential travel in a circular pattern, rotating on a centrally located axis. The rigs are equipped with endguns designed to spray water into the corners of a field that would normally not receive water from the circular irrigation system. When the rig approaches the point where the endgun is tangential to the end of the field, the machines are designed to turn off the water supply to the endguns in order to prevent water from being sprayed onto non-field areas. The evidence revealed that during the irrigation season the machines sometimes malfunctioned, "spraying ... water on public highways (including Interstate 65) and in ditches and uncultivated areas...." *Id.* The district court reasoned that because "ground water has been declared by the legislative action in the State of Indiana to be both a precious and expendable resource, spraying the same on Interstate 65 involves a supreme waste of that resource." *Id.* The district court added that "[t]here is nothing in ... any ... decision or authority in the State of Indiana for permitting the same." *Id.* The record clearly reveals that the district court made no finding that the malfunctioning of the endguns caused any injury to the plaintiffs. Instead, based solely on the fact that the spraying of water onto roadways, uncultivated fields, and ditches constitutes waste, the district court granted a "temporary injunction in regard to the discharge of water from endguns...." *Id.* at 1352. The court further admonished that "[t]he burden is and will be on the defendant Prudential to demonstrate that *all* irrigation equipment is in realistic and not just theoretical working order so as to prevent this unneeded waste of water from the malfunctioning of the aforesaid endguns." *Id.* at 1351 (emphasis original).

On appeal, the parties do not dispute the district court's findings of fact. Prudential's sole claim is that the district court's order, enjoining the spraying of all water from the endguns, is improper because there was no evidence introduced at trial to even suggest that such endgun spraying caused any harm to the plaintiffs. Prudential thus argues that the entry of the injunction constitutes an abuse of discretion. The plaintiffs respond that the spraying of water on roadways, uncultivated fields, and ditches constitutes an unlawful waste of water obtained from the bedrock aquifer,

and thus the district court properly enjoined such spraying.

## II

At the outset we note that the district court refers to the relief granted as a *"temporary injunction ... until further order of this court."* *Id.* at 1351 (emphasis added). The record reveals, however, that the parties engaged in ten months of discovery before presenting evidence to the district court on the issue of injunctive relief. Moreover, the court conducted a seven-day bench trial, observed some thirty witnesses, heard some 1,745 pages of testimony, and examined some 175 exhibits before ruling on the plaintiffs' claim for injunctive relief. In view of the exhaustive and detailed evidence presented at trial, the district court properly observed that "[t]he case is now ripe for decision on the injunctive phase." *Id.* at 1338. The parties have thoroughly addressed all phases of the injunctive relief issue and, as a result, the relief granted by the district court is by no means either temporary or preliminary in nature. Rather, the district court *permanently* enjoined Prudential from spraying water from the endguns until it can "demonstrate that *all* irrigation equipment is in realistic and not just theoretical working order...." *Id.* at 1351 (emphasis original). Indeed, the plaintiffs admit in their brief that "[t]his is an appeal from a hearing on a permanent injunction." In view of the fact that the parties have presented exhaustive evidence on the injunctive issue, and the district court has granted permanent rather than preliminary relief, we treat the district court's ruling as a permanent injunction.[4] In this circuit, it is well-settled that our review of a permanent injunction "is limited to the determination of whether the district court abused its discretion in deciding that the circumstances of the case justified injunctive relief." *Federal S & L Ins. Corp. v. PSL Realty Co.*, 630 F.2d 515, 520 (7th Cir.1980), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975)). *See also Beneficial Finance Co. of Wisconsin v. Wirtz*, 346 F.2d 340, 344 (7th Cir.1965) (permanent injunction not subject to review except upon a showing of clear abuse). The issue before this court is whether the district court abused its discretion in enjoining Prudential from spraying water through the endguns of its central pivot irrigation system. To resolve this issue we turn to Indiana law, which the parties agree is controlling in this diversity action.

In *Wiggins v. Brazil Coal and Clay Corp.*, Ind., 452 N.E.2d 958 (1983) (*"Wiggins"*), the Supreme Court of Indiana clarified the Indiana law of subterranean water rights. In *Wiggins*, one of the plaintiffs, Charles Wiggins, owned 121 acres of land in Clay County, Indiana, that included the eastern one-half of a ten acre fresh water lake. The lake was formed in 1960 as a result of coal strip mining operations in the area and was fed exclusively by percolating and surface waters, not by any stream. In April 1962, the lake was approximately twenty to twenty-five feet deep and by September 1977, the level of the lake had risen another eighteen feet. In 1975, Wiggins began to develop his land as a subdivision for recreational, residential, and retire-

---

**4.** This court has jurisdiction of the appeal in this matter pursuant to 28 U.S.C. § 1292(a)(1) (1982), which provides:

"The courts of appeals shall have jurisdiction of appeals from:
(1) Interlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court...."

In *Parks v. Pavkovic*, 753 F.2d 1397 (7th Cir. 1985), we explained that "28 U.S.C. § 1292(a)(1) allows the immediate appeal of an interlocutory order granting an injunction, and the injunction need not be a preliminary one." 753 F.2d at 1402–03. Indeed, the "[g]rants of permanent injunctions' always are [appealable under 28 U.S.C. § 1292(a)(1)]." *Id.* at 1403 (citing 16 Wright, Miller, Cooper & Gressman, Federal Practice and Procedure § 3924, at 67 (1977)). Thus, we have jurisdiction to review the district court's grant of permanent injunctive relief even though the parties have not yet litigated the issue of damages. *See Schulner v. Jack Eckerd Corp.*, 706 F.2d 1113, 1114 (11th Cir.1983).

ment homes. In 1977, the defendant, Brazil Coal and Clay Corp., began coal strip mining operations north of Wiggins' property and when the company reached the depth of fifty to fifty-five feet, "substantial amounts of water rushed into the bottom of the mining pit from below, flooding the pit." *Id.*, 452 N.E.2d at 960. The coal company responded by pumping this excess water out of the coal pit in order to continue its mining operation. Unknown to the coal company, its pumping activities severely reduced the water level of the lake on Wiggins' property as the strip mining pit and the lake were connected by old, deep mine shafts. Wiggins filed an action in Indiana state court requesting injunctive relief and damages. The trial court found that "in August of 1977 it was necessary and reasonable to remove this water to continue the Defendant mining operation. The evidence was uncontroverted that there was no alternative or option available to Defendants if they were to continue with the mining operation." *Id.*, 452 N.E.2d at 961. The trial court further found that, "[t]he Defendant's use or removal of water from its property was for the reasonable and beneficial use of the land in connection with its enjoyment of the land and for the ordinary purposes of mining and improving the land." *Id.* Thus, the trial court "concluded that the strip mining company dealt with the water in a manner which was reasonably necessary for some beneficial purpose relating to the land and that the pumping and removal of the water from its mining operations was both reasonable and necessary." *Id.*, 452 N.E.2d at 961–62.

The Indiana Supreme Court affirmed the trial court's decision, reasoning that under the Indiana law of subterranean water rights, "[w]ater which percolates away underground through porous earth from beneath one lot to surrounding lands, no longer belongs to the owner of the lot." *Id.*, 452 N.E.2d at 963. According to the Court:

"[w]hen an owner takes hold of his lands, putting them to his own special uses, and altering them to his own purposes, he necessarily works a change in circumstances, even an injury, upon adjoining and neighboring lands. In recognition of this fact, the property in lost waters is cast and enforced by courts in a manner which recognizes that some of these injuries are the necessary result of proper and legitimate utilization of land...."

*Id.*, 452 N.E.2d at 964. Thus, in *Wiggins* the Indiana Supreme Court held that:

"the law governing property in ground water applies in the case on appeal. Ground water is part of the land in which it is present and belongs to the owner of that land. *It may be put to use to the fullest extent to further enjoyment of the land, however this right does not extend to causing injury gratuitously or maliciously to nearby lands and their owners.*"

*Id.* (emphasis added).[5] The court further ruled that because "[t]he loss of water from [Wiggins' lake] was not part of a scheme to bring about injury and was not merely gratuitous," Wiggins was not entitled to damages or injunctive relief. *Id.*

In addition to the Indiana law of subterranean water rights set forth in *Wiggins*, there is Indiana statutory law that applies to the facts in this case. Indiana § 13–2–2–2 (1982) provides that:

"It is hereby declared a public policy of this state in the interest of the economy, health and welfare of the state and its citizens, to conserve and protect the ground water resources of the state and for that purpose to provide reasonable regulations for its most beneficial use and disposition."

In furtherance of the Indiana policy to conserve ground water, the Indiana legislature passed the "Water Rights: Emergency Regulation" Act in February 1982, to ensure residents of Jasper and Newton Coun-

---

5. In dissent, Justice Hunter summarized the majority's holding in *Wiggins* as "the rule that ground water belongs to the owner of the land under which it flows and that it may be used as the owner wishes despite injury to neighboring owners of ground water, unless the injury is caused 'gratuitously or maliciously.'" *Wiggins,* Ind., 452 N.E.2d at 965 (Hunter, J., dissenting).

ties, including the plaintiffs, that their wells will continue to furnish an adequate supply of water. The Indiana legislature, fully aware of the "unique combination of unconsolidated glacial deposits, bedrock deposits, soil composition, natural ground water table, and the potential for irrigation with ground water associated with the counties of Jasper and Newton," authorized the Indiana Department of Natural Resources to monitor Jasper and Newton Counties. Ind.Code § 13-2-2.5-1 (1982). Pursuant to the Indiana law:

"Within twenty-four (24) hours after receiving a written complaint from a householder or livestock farmer in Jasper or Newton County that a well on property in his possession has failed to furnish its normal supply of water, the director shall cause an onsite investigation to be made. If the investigation discloses:

(1) that the well fails to furnish its normal supply of water;

(2) that the failure is caused by a substantial lowering of the level of ground water in the area; and

(3) that the well and its equipment conforms to the recommended guidelines of the department issued under section 5 (13-2-2.5-5) of this chapter; the director shall declare an emergency and restrict the quantity of water that a person may extract from any well in those counties that is capable of producing more than one hundred thousand (100,000) gallons per day. The restriction shall be expressed in gallons of water, may apply to one (1) or more wells in all or a part of the two (2) counties, and may be broadened or narrowed as appropriate. The restriction shall be lifted as soon as justified by the changed conditions."

Ind.Code § 13-2-2.5-3 (1982). It is within this statutory framework, and the relevant

Indiana law set forth in *Wiggins*, that we review the district court's permanent injunction.

The parties do not dispute the fact that use of ground water for purposes of agricultural irrigation constitutes an appropriate and beneficial use of that water under Indiana law. Indeed, the district court found that "[t]here is no doubt that under both the common law and the Acts of 1983 in Indiana the extraction of ground water for purposes of agricultural irrigation constitute [sic] an appropriate use thereof." *Prohosky*, 584 F.Supp. at 1344.[6] Moreover, the parties agree that Prudential is not maliciously withdrawing water from the bedrock aquifer underlying the Fair Oaks Farm in an attempt to injure the plaintiffs. The district court properly observed that "there is no argument that Prudential is attempting to deliberately and pervasively with malice extract ground water purely to deprive adjacent landowners of the opportunity to do the same thing." *Id.* at 1343. The only point of dispute is whether Prudential's spraying of water through endguns onto roadways, uncultivated fields, and ditches contravenes Indiana law.

In *Wiggins*, the Indiana Supreme Court ruled that ground water "may be put to use to the fullest extent to further enjoyment of the land...." 452 N.E.2d at 964. Thus, under Indiana law, Prudential is entitled to use the subterranean water underlying the Fair Oaks Farm to irrigate its farmland. The Indiana Supreme Court cautioned, however, that "this right does not extend to causing injury gratuitously or maliciously to nearby lands and their owners." *Id.* In the present case, the district court made no finding, for purpose of injunctive relief, that Prudential's irrigation system caused harm to the plaintiffs. More specifically, the district court made

---

**6.** In 1983, the Indiana legislature enacted the "Water Resource Management" Act, providing that:

" 'Beneficial use' means the use of water for any useful and productive purpose and includes, but is not limited to, domestic, *agricultural (including irrigation)*, industrial, com-

mercial, power generation, energy conversion, public water supply, waste assimilation, navigation, fish and wildlife, and recreational uses."

Ind.Code Ann. § 13-2-6.1-1 (Burns Cumm. Supp.1984) (emphasis added).

no finding that Prudential's spraying of water through endguns in any way injured the plaintiffs. In fact, the record reveals that at the very most, two percent of the water used by Prudential in its irrigation system is discharged through the endguns. When one considers that such endguns discharge water mainly upon cultivated farmland and that the remaining ninety-eight percent of the water is, likewise, discharged upon cultivated farmland, the amount of the water sprayed onto roadways, uncultivated fields, and ditches is minimal, at best. The plaintiffs had a more than ample opportunity at trial to establish that Prudential's spraying of water through the endguns actually injured the plaintiffs. The record reveals, however, that for purposes of injunctive relief, the plaintiffs failed to introduce sufficient evidence to prove a causal connection between Prudential's spraying of water through endguns and a resulting injury to the individual plaintiffs. In view of the lack of evidence presented on this issue at trial, the district court made no finding that Prudential's discharge of water through the endguns actually injured the plaintiffs. Upon our independent review of the record we are unable to discern any evidence that might suggest that the malfunction of endguns on Prudential's irrigation system actually harmed the plaintiffs. Accordingly, we hold that Prudential is not in violation of Indiana law, as set forth in *Wiggins*, as its beneficial and appropriate use of ground water has not been shown to injure the plaintiffs.

We further note that the Indiana legislature is cognizant of the potential water shortage problem in Jasper and Newton Counties and has acted judiciously to protect the residents of those counties, including the plaintiffs. The Indiana legislature has directed the Indiana Department of Natural Resources to monitor the ground water levels within Jasper and Newton Counties in order to ensure area residents that their wells will continue to furnish an adequate supply of water. If any resident, including any of the plaintiffs, experiences problems in obtaining their normal water supply, that individual may immediately contact the Indiana Department of Natural Resources to investigate the situation. Similarly, if any resident believes that water in the area is being misused or wasted, they may inform the Indiana Department of Natural Resources to investigate the alleged problem. We are mindful, of course, that water is a limited resource that must be preserved for the common good of all landowners. We certainly do not condone the spraying of even a very limited amount of this valuable resource (i.e. 2%) on highways, uncultivated fields, and ditches; but absent proof of any injury to an adjacent landowner, Indiana law does not forbid such activity. This is especially true in the present case where the amount of water in question is, at best, minimal and only incidental to the appropriate and beneficial use of agricultural irrigation. The district court, in granting a preliminary injunction preventing Prudential from discharging water through the endguns of its central pivot irrigation system, misapplied the relevant Indiana law. Accordingly, we hold that the district court abused its discretion in entering the permanent injunction. In view of the exhaustive evidence presented at trial, and the district court's entry of a permanent injunction, we further rule that the plaintiffs are precluded from introducing additional evidence on the issue of injunctive relief and must proceed to the damage portion of this litigation.

### III

We reverse and remand this case to the district court with instructions to vacate the injunction and proceed with the damage portion of this litigation.

Circuit 18 shall apply on remand.