Charles A. **WIGGINS and Ruth P. Wiggins, d/b/a Sugar Ridge Lake Estates; Jack Stevenson; James M. Deady and Audrey C. Deady; Norris E. Sherman and Lois M. Sherman; Hubert A. Scheidler and Ruth G. Scheidler; Eugene D. Walters and Antoinette A. Walters; Daniel J. Sullivan, Jr. and Gail G. Sullivan; Wayne Karanovich and Martha G. Karanovich; Robert C. Trout and Marilyn L. Trout; Don E. Handlin; Carl R. Shepherd and Virginia L. Shepherd, Appellants (Plaintiffs Below),**

v.

**BRAZIL COAL AND CLAY CORPORATION, Appellee (Defendant Below).**

No. 1–1181A328.

Court of Appeals of Indiana,
First District.

Sept. 30, 1982.

Rehearing Denied Nov. 5, 1982.

Hansford C. Mann, Mann, Chaney, Johnson, Hicks & Goodwin, Terre Haute, for appellants.

Cox, Zwerner, Gambill & Sullivan, Terre Haute, James B. Sparks, Bloomfield, for appellee.

ROBERTSON, Judge.

The plaintiffs-appellants, Charles A. and Ruth P. Wiggins (Wiggins) appeal the decision of the trial court which found in favor of the Brazil Coal and Clay Corporation (Brazil Coal). The Wigginses and other property owners, in a subdivision in Clay County called Sugar Ridge Lake Estates, allege that the surface mining activities of Brazil Coal caused the loss of the water in the lake.

We reverse and remand.

The lake was formed prior to 1960 as a result of strip mining. Prior to the activities of Brazil Coal, the lake was approximately 10 acres in size and was 35–45 feet deep. The lake was fed by percolating subterranean water and surface water. The Wigginses used the lake for their private enjoyment between 1962 through 1970. The lake was utilized for catfish farming between 1970 through 1973. The general public could fish the lake during this time for a daily fee. The catfish farm was closed in 1975 and the Wigginses began to develop a subdivision around the lake called Sugar Ridge Lake Estates. The other landowners in Sugar Ridge Lake Estates joined the Wigginses in this lawsuit.

Brazil Coal is a surface mining company which began strip mining near Center Point, Indiana in 1975. In surface mining operations, a dragline digs down into the earth until it reaches a seam of coal in order to allow other equipment to remove the coal. Brazil Coal's operation consists of stripping pits which are ninety feet wide and run in a north-south direction. The presence of water in the pits creates prob-

lems for the operation and, if not removed, can prevent the mining.

In August, 1977, Brazil Coal encountered flooding in its pits while the dragline was digging at a depth of 55 feet. Brazil Coal moved the dragline approximately one hundred feet north, began digging, and again encountered water. The dragline was then moved 500 feet north where no water was encountered. While this latter pit was being mined, Brazil Coal drilled two wells and began pumping to dewater the original pits. While Brazil Coal engaged in the dewatering process, it was discovered that the water level of the Wigginses' lake was falling. The trial court found that the water in the pits was coming from Wigginses' lake by abandoned deep mine shafts situated beneath the upper vein of coal. Brazil Coal also installed sump pumps in the pits to aid the dewatering process.

The trial court found that it was necessary for Brazil Coal to dewater its pits in order to continue its mining operations. It was also found that Brazil Coal conducted its mining operations in a safe, lawful and reasonable manner and that the removal of the water from Brazil Coal's pits was for the reasonable and beneficial use of its land.

The trial court concluded that Brazil Coal was entitled to use underground water since its use was reasonably necessary for some beneficial purpose relating to the land. The court held that the pumping and removal of water in relation to mining operations was both reasonable and necessary. The trial court concluded that Wigginses were not entitled to damages or injunctive relief.

The Wigginses argue that the trial court's conclusions of law are contrary to law and that the facts do not support these conclusions. The Wigginses also allege that facts found by the trial court support a finding on their behalf and against Brazil Coal.

There are two traditional positions regarding the law of subterranean water; the English Rule and the American rule. The English Rule is described in *Finley v. Teet-*

*er Stone,* (1968) 251 Md. 554, 248 A.2d 106 as follows:

Thus, under the English Rule, the owner of the freehold was deemed to own all of the percolating waters beneath the surface of the land as he owned the soil and minerals beneath the surface of the land and the air and sky above the surface—an application of the maxim *cujus est solum, ejus est usque ad coelum et ad inferos.* The English Rule is sometimes referred to as the "Absolute Ownership Rule," as the owner of the surface of the land had the absolute right to intercept underground percolating water before it left his property for whatever purpose he pleased and without regard to the effect of such interception on the owner of neighboring land.

248 A.2d 110.

The American Rule also recognizes the overlying landowner's proprietary interest in the water beneath his land.

The American, as distinguished from the English rule, is that, while the owner of land is entitled to appropriate subterranean or other waters accumulating on his lands, which thereby become a part of the realty, he cannot extract and appropriate them in excess of a reasonable and beneficial use upon the land he owns, unconnected with the beneficial use of the land, especially if the exercise of such use is injurious to others, who have substantial rights to the water.

*Metropolitan Utilities Dist. v. Merritt Beach Co.,* (1966) 179 Neb. 783, 140 N.W.2d 626, 637.

A third doctrine, called the correlative rights or California rule has arisen. This rule holds that the rights of all landowners over a common aquifer are coequal or correlative. Thus one landowner cannot extract more than his share of the water even for use on his own land where others' rights are thereby injured. *Prather v. Eisenmann,* (1978) 200 Neb. 1, 261 N.W.2d 766.

Additionally, subterranean waters are generally classified as two types: 1) underground streams and 2) percolating waters.

*Finley v. Teeter Stone, supra.* Where the subterranean water flows in a definite channel, the same rules of law apply to it as apply to a surface stream. *Gagnon, et al. v. French Lick Springs Hotel Co.,* (1904) 163 Ind. 687, 72 N.E. 849. Therefore, the overlying landowners have riparian rights.

Brazil Coal argues that the trial court's decision must be affirmed regardless of whether the English Rule or the American Rule is applied because the trial court ruled that the dewatering was necessary and reasonably related to the coal mining activities. The Wigginses contend that the standard of reasonableness must consider the needs of all landowners, not just the interests of the overlying landowners. They also argue their position is supported by the Restatement of Torts, public policy as contained in the statutes regulating water use, and the federal law governing strip mining.

Indiana has rendered very few decisions regarding the law of subterranean water. In *New Albany and Salem Railroad Co. v. Peterson,* (1860) 14 Ind. 112, our supreme court adopted the English Rule. However, Indiana's adherence to this doctrine was abrogated in *Gagnon, supra. Gagnon* involved the intentional diversion of subterranean stream in order to destroy the appellee's hotel business. The supreme court stated:

> The strong trend of the later decisions is toward a qualification of the earlier doctrine that the landowner could exercise unlimited and irresponsible control over subterranean waters on his own land, without regard to the injuries which might thereby result to the lands of other proprietors in the neighborhood. Local conditions, the purpose for which the landowner excavates or drills holes or wells on his land, the use or nonuse intended to be made of the water, and other circumstances have come to be regarded as more or less influential in this class of cases and have justly led to an extension of the maxim, "*Sic utere two*

*ut alienum non laedas* "[1] to the rights of landowners over subterranean waters, and to some abridgment of their supposed power to injure their neighbors without benefiting themselves.

163 Ind. at 697–698, 72 N.E. 849.

We believe this language requires this tribunal to limit the common law rights to blindly explore and utilize subterranean water without regard to injury to adjoining landowners.

There is another reason mandating a change from the common law in this case. The Wigginses have raised federal law in support of their positions. The Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328, has provisions regulating strip mining activities. It provides:

> Water rights and replacement
>
> (a) Nothing in this chapter shall be construed as affecting in any way the right of any person to enforce or protect, under applicable law, his interest in water resources affected by a surface coal mining operation.
>
> (b) The operator of a surface coal mine shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where such supply has been affected by contamination, diminution, or interruption proximately resulting from such surface coal mine operation.

30 U.S.C. § 1307.

The successor trial judge, ruling on the motion to correct errors, held that he had no jurisdiction to enforce this provision.

■ The Surface Mining and Reclamation Act has been subjected to much litigation concerning whether its provisions usurp the states' traditional powers to govern land use. Indiana challenged the statute's prime farmland provision, as well as

---

1. Use your property in such a manner as not to injure that of another. Black's Law Dictionary. (4th Ed. 1968).

other land restoration provisions, as contravening the Commerce Clause, the guarantees of due process and equal protection of the Due Process Clause of the Fifth Amendment, and the Tenth Amendment. These provisions were held unconstitutional by the District Court,[2] however, the Supreme Court reversed this decision in *Hodel v. Indiana,* (1981) 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40. In writing for the Court, Justice Marshall opined that the land reclamation provisions were a valid exercise of Congress's power pursuant to the Commerce Clause to ensure that coal production would not be at the expense of agriculture, the environment, or public health and safety. The Court also ruled that the reclamation provisions did not violate the Tenth Amendment because only private businesses and industries were regulated. Although the trial court may not have had jurisdiction to enforce the federal statute, the Wigginses would be entitled to have the water replaced if they could establish that Brazil Coal's dewatering proximately caused the loss of water in their lake. If the trial court's decision were to be affirmed, our common law would be extended to contradict federal law. The principle of preemption and the Supremacy Clause of the Constitution will not allow such a result. The question which naturally follows is what rule should be adopted.

The English and American Rules were based upon the concept of absolute ownership of property. *Prather v. Eisenmann, supra.* The development of modern society has diminished this theory. The expansion of conservation, nuisance, flood control, zoning, and pollution control laws demonstrate only a few areas in which land use has been regulated. Indiana renounced the strict English Rule in *Gagnon, supra.* Moreover, both the English and the American Rules were formulated in order to allow courts to escape the responsibility of decision making in an era of limited scientific knowledge of hydrology. *State v. Michaels Pipeline Construction Co.,* (1974) 63 Wis.2d 278, 217 N.W.2d 339.

The American Rule contains inconsistencies which limit its usefulness in a modern society. If the subterranean water is percolating, the American Rule applies. In applying the American Rule, the interests of adjacent landowners are only in issue when the appropriator uses water in excess of the reasonable and beneficial use of it upon his land, and that excess is injurious to the adjacent landowners. *Prather v. Eisenmann, supra.* If the subterranean water comes from a subterranean stream, the overlying landowners have riparian rights to the water. The rights of riparian owners are discussed in *Valparaiso City Water Co. v. Dickover,* (1896) 17 Ind.App. 233, 46 N.E. 591, where this court stated:

> Each riparian proprietor is entitled to a reasonable use of water for purposes not domestic. The question whether the quantity which he is diverting is reasonable is not to be determined, in a case like this, by the requirement of his business, but rather by determining whether his use is reasonable and apportionate with reference to the quantity of water usually in the stream or body of water, and whether the complaining riparian owner is substantially damaged by being deprived of his reasonable use. If the business require [sic] and use [sic] more water than can be permanently diverted without injury to the right of another riparian proprietor, he has a cause of action. The necessities of one proprietor's business cannot be taken as the standard of another's rights in the water which have a right to use to a reasonable extent.
>
> In determining the use that may be made of water by a riparian owner, reference must be had, therefore, to the quantity of water in the stream or lake.

17 Ind.App. at 237–238, 46 N.E. 591.

The determination of liability is dependent upon the identification of the source of the subterranean water because if the waters are percolating, then no liability exists unless the use of the water is not reasonably related to the beneficial use of the land. However, if the appropriator diverts

2. *State of Ind. v. Andrus,* 501 F.Supp. 452, (S.D. Ind. 1980).

water from a subterranean stream, reasonableness and therefore, liability, is measured by a different standard. We can conceive of no logical reason to maintain such a distinction. To perpetuate this distinction forces landowners to operate in uncertainty. In the present case, neither party was aware of the relationship between the water in the abandoned mine shaft and the lake. Under the current law, Brazil Coal could not determine its liability until after the Wigginses had been injured.

The Supreme Court of Wisconsin faced a similar problem in *State v. Michaels Pipeline Construction Co., supra.* The court rejected the common law ruling of *Huber v. Merkel,*[3] which held there was no cause of action for interfering with subterranean water. In rejecting *Huber,* the court stated:

> Even in 1903 when the *Huber v. Merkel* case was written, the awe of mysterious, unknowable forces beneath the earth was fast becoming an outmoded basis for a rule of law. The court in *Huber v. Merkel* discussed the subject of artesian water with a certain degree of sophistication. However, artesian water may have been better understood than other types of percolating ground water. However, today scientific knowledge in the field of hydrology has certainly advanced to the point where a cause and effect relationship can be established between a tapping of underground water and the level of the water table in the area so that liability can be fairly adjudicated consonant with due process. Our scientific knowledge also establishes the interdependence of all water systems. . . .

> It makes very little sense to make an arbitrary distinction between the rules to be applied to water on the basis of where it happens to be found. There is little justification for property rights in ground water to be considered absolute while rights in surface streams are subject to a doctrine of reasonable use. The *Huber v. Merkel* case certainly gives no explanation of why a property right in ground

water should be an exception to the general maxim—*sic utere tuo ut alienum non laedas.*

217 N.W.2d 345.

We believe that our law should reflect not only the scientific advances in hydrology but must also reflect the changes in our society. The American Rule is no longer appropriate because it is premised upon a theory of absolute ownership which has been superseded by modernization. It is unpredictable because liability is dependent upon the water's source and not upon the duties or actions of a party, and it was adopted in order to avoid decisions in an area of limited scientific knowledge which has since advanced.

The California doctrine of correlative rights applies the concept of reasonable use but requires apportionment of subterranean water when the supply is insufficient for all users. This doctrine was rejected by the Wisconsin Supreme Court in *State v. Michaels Pipeline Construction Co., supra* because water is not scarce in that state. Likewise, we are fortunate in Indiana not to suffer the scarcity of water that exists in the western states which adhere to this doctrine. This court does not subscribe to adopting a doctrine based upon a premise nonexistent in our state when a better alternative is available.

The Restatement of Torts *2nd* § 858 is a well formulated rule which is the logical answer to this problem. It provides:

Liability for Use of Ground Water

(1) A proprietor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless

(a) the withdrawal of ground water unreasonably causes harm to a proprietor of neighboring land through lowering the water table or reducing artesian pressure,

(b) the withdrawal of ground water exceeds the proprietor's reasonable share of the annual supply or total store of ground water, or

**3.** (1903) 117 Wis. 355, 94 N.W. 354.

(c) the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water.

(2) The determination of liability under clauses (a), (b) and (c) of Subsection (1) is governed by the principles stated in §§ 850 to 857.

The comments elaborate that this rule retains the basis of the common law in regards to the capture and withdrawal of water. It encourages the use of subterranean water and applies riparian principles. Subsection (c) substitutes a pragmatic test for determining liability for the uncertainty which results from the common law standards.

█ Given this framework, we believe that the trial court's findings of fact mandate a reversal. Two dispositive findings provide:

19. As the defendant was dewatering its pits by pumping water from the pits, it was discovered that the water level of the plaintiffs' strip lake was falling. *It was determined that the water flooding defendant's pit was coming from plaintiffs' strip lake by way of old deep mine shafts or otherwise beneath the upper vein of coal. The dewatering of defendant's pits resulted in the emptying of plaintiffs' strip lake because the water flooding defendant's pit was coming from plaintiffs' strip lake.*

22. *The water flooding defendant's pit in August of 1977 was coming from plaintiffs' strip lake by way of deep mine shafts and laterals or otherwise.* It was and is impossible to determine the path the water was taking from plaintiffs' lake to the deep mine workings below defendant's pits. (Emphasis added.).

These findings lead to the conclusion that Brazil Coal's dewatering of its pits caused the Wigginses' injury.

Brazil Coal has submitted the case of *Argyelan v. Haviland,* (1982) Ind., 435 N.E.2d 973, to support its position. *Argyelan* is distinguishable because it retains the common enemy doctrine in dealing with surface water drainage problems. Moreover, the opinion places great emphasis upon creating certainty in analyzing water law problems. We believe the Restatement position retains the benefits of the common law rules and yet alleviates the uncertainty which those rules inherently create.

In rendering this opinion, this court does not easily reject the common law rules. As is stated in *Brooks v. Robinson,* (1972) 259 Ind. 16, 284 N.E.2d 794.

Judicial devotion to the doctrine of *stare decisis* is indeed a justifiable concept to be followed by our courts. However, it cannot and must not be so strictly pursued to the point where our view is opaqued and reality disregarded. To do so is to envision the common law to be as immutable as the laws of the Medes and Persians, and thus render our system of jurisprudence forever impotent. The strength and genius of the common law lies in its ability to adapt to the changing needs of the society it governs.

284 N.E.2d 797.

Equity demands a departure from *stare decisis* and the traditional common law rules. We have no doubt that it was necessary for Brazil Coal to dewater its pits in order to mine coal. However, a principle of modern law is that a business should bear its own costs, burdens, and expenses of its operation because they can be distributed to the consumer through the price mechanism. *Enos Coal Mining Co. v. Schuchart,* (1962) 243 Ind. 692, 188 N.E.2d 406. To hold otherwise, would result in a shifting of the cost back upon the innocent landowners. Any argument that this opinion will retard progress and business exploration due to the cost of potential damages fails because it is nothing more than an argument as to who shall bear the costs; the adjoining landowners who suffer the injury or the business which can pass the cost to its consumers.

The trial court's judgment is reversed and this case is remanded for proceedings not inconsistent with this opinion.

RATLIFF, P. J., and YOUNG, P. J. (sitting by designation), concur.