The NATURAL RESOURCES COMMIS-
SION OF the STATE OF INDIANA, the
Indiana Department of Natural Re-
sources, and Jack L. Jarrett, Respon-
dents–Appellants,

v.

AMAX COAL COMPANY and
Amax Coal Industries, Inc.,
Petitioners–Appellees.

INDIANA DEPARTMENT OF NATURAL
RESOURCES, Natural Resources Com-
mission, Bureau of Mine Reclamation,
Division of Reclamation, Patrick R.
Ralston, as Director of the Indiana De-
partment of Natural Resources, Mike
Long, as Deputy Director of the Bureau
of Mine Reclamation, and Mike Spon-
sler, as Director of the Division of Rec-
lamation, Respondents–Appellants,

v.

STATE ex rel. B & LS CONTRACTING,
INC. and Shand Mining, Inc.,
Petitioners–Appellees.

No. 49A04–9112–CV–419.

Court of Appeals of Indiana,
Fourth District.

Nov. 24, 1992.

Rehearing Denied Jan. 7, 1993.

Linley E. Pearson, Atty. Gen., Myra P.
Spicker, Deputy Atty. Gen., Indianapolis,
for respondents-appellants.

Max E. Goodwin, Mann, Chaney, John-
son, Goodwin & Williams, Terre Haute,

**1350**

David H. Pope, Carr, Tabb & Pope, Atlanta, Ga., for Jack Jarrett.

G. Daniel Kelley, Jr., W.C. Blanton, Edward P. Steegmann, Ice Miller Donadio & Ryan, Indianapolis, for petitioners-appellees. ·

MILLER, Judge.

This is a consolidated case involving the inter-relationship of surface coal mining and ground water rights in Indiana. The common question in both cases is whether the Department of Natural Resources by the Natural Resources Commission (collectively—the Department) has the authority under the Indiana Surface Mining Control and Reclamation Act (I–SMCRA)[1] to affect in any way existing water rights. After first deciding that I–SMCRA preserved state water rights and therefore could not impact existing common law water rights, the Department changed its mind and attempted to regulate the use of ground water by surface mines so that such use would not result in damage to property located outside the surface mine area. After an exhaustive series of administrative hearings followed by judicial review, the trial court held that the Department had it right the first time—nothing in I–SMCRA can affect in any way existing common law water rights. Therefore, the trial court found that the Department had exceeded its authority by issuing orders that interfered with the common law water rights of

the coal miners to make any non-malicious use of ground water on their premises.

We agree with the trial court and affirm.

## FACTS AND PROCEDURAL HISTORY

Surface coal mining permits in Indiana are issued by the Department pursuant to provisions of I–SMCRA, Indiana's counterpart to the Federal Surface Mining Control and Reclamation Act of 1977 (F–SMCRA),[2] and the regulations implementing I–SMCRA set forth at 310 Ind.Administrative Code 12. Before beginning surface coal mining, an operator is required to obtain a permit from the Department. These permits are approved only after intense scrutiny of the proposed mining operations and the anticipated effects related to them by the Department's technical experts.

Appellee AMAX Coal Company (AMAX) sought a permit to extend its Minnehaha Mine, Cass Pit, a surface mine in Sullivan County to mine a new area of what is known locally as the No. 7 coal seam.[3] Appellee B & LS Contracting (B & LS) had been conducting surface mining operations at the Hornet Mine in Clay County since a permit was issued in 1989 in order to recover coal owned by Shand Mining, Inc.

AMAX's permit application described its proposed operations, which included pumping water on its lands from the abandoned mines in the No. 6 coal seam, to prevent flooding in its mining pit. Appellant Jack L. Jarrett (Jarrett), an adjacent surface landowner, opposed the operation arguing

---

1. Ind.Code 13–4.1. *et seq.*

2. 30 U.S.C. §§ 1201 *et seq.*

3. Seven major layers or seams of coal are located in this area. The coal seams are numbered from 1 to 7, with No. 1 being the deepest and No. 7 being closest to the surface. The coal seams are separated by layers of sedimentary rock, i.e., limestones, sandstones, shales, and siltstones. The surface layer consists of glacial till (loose rocks and soil deposited by the glaciers that wandered over Indiana during the past 100,000 years or so). The easiest way to visualize the geology of this area is to imagine a seven layer chocolate cake, where the layers of chocolate represent the coal seams, the cake represents the sedimentary rocks, and the icing represents the glacial till.

  The deeper seams were mined by subsurface techniques starting around the turn of the cen-

tury. The No. 6 coal seam, which varies from five (5′) to eight feet (8′) thick in this area, is the site of the Regent VI and Vandalia # 17 mines. These mines used what is known as "room and pillar" mining techniques. Extraction ratios reached levels in excess of 75%, which means that more than 75% of the coal originally in place was removed. Both mines are abandoned, Regent since 1954 and Vandalia since 1933. The abandoned mines have flooded. Parts of the Regent are still intact, most of Vandalia has collapsed. The old mines are continuing to deteriorate and eventually will completely collapse.

  There also are abandoned mine works below the No. 6 coal in the No. 4 and No. 5 seams under the surface area owned by Jarrett. The conditions in these mines were not discussed.

that the removal of water and/or lowering of the existing water head (pressure) in the No. 6 seam abandoned mines might cause subsidence on his land.[4] Jarrett argued that the water was "substituted support" which replaced the natural support removed by the mining of the No. 6 coal. The permit was approved in May, 1989, except for, *inter alia,* the pumping of water from the No. 6 coal. The Department added what is now known as "Condition 12" to the permit. Condition 12 prohibited additional depressurization wells in the permit amendment area "until sufficient detail is added to the statement of probable hydrologic consequences to determine the effects that dewatering may have on potential subsidences both with the permit and adjacent off site areas." *See* R. 1683, *Natural Resources Commission et al. v. Amax Coal.* AMAX sought administrative review challenging the Department's jurisdiction and authority to impose Condition 12. The Administrative Law Judge overruled AMAX's objections to Condition 12. That ruling was in turn affirmed by the Department which then remanded the remaining questions regarding the permit to the Administrative Law Judge for further proceedings.

The trial court held that the imposition of Condition 12 on the Cass permit was unlawful and in excess of the Department's authority. The court found that the escaping water which appeared on AMAX's land was a part of its land and belonged to AMAX. Under Indiana water rights law, there was no obligation of lateral support placed upon land owners to prevent the escape of ground water from other lands. In addition, the trial court found that there is nothing in Indiana law that would allow a landowner whose predecessors have sold rights—including the removal of natural support and the right to subside the surface—to replace these rights by limiting the rights of others or by placing on others new or additional lateral support duties. Finally, the trial court found that the undisputed facts showed that the natural necessary subjacent support was removed by underground mining in the No. 6 coal seam and the subsequent flooding of the abandoned mine works even further decreased the remaining support. Percolating ground water could not, and did not, replace the naturally necessary support.[5] Therefore, the trial court reversed the order of the Department and remanded the case.

B & LS had been pumping both surface and ground water which accumulated in its pit. The removal of the ground water had the potential to lower water in bodies of water in the vicinity of the Hornet Mine. All of these bodies of water are former strip mines which have filled with water over the years since mining ceased. None are natural lakes or ponds. These former strip pits have hydrogeological connections with the Hornet Mine of varying types and degrees, some natural and some caused by mining activity. As a result, the removal of water from the active mine had lowered water levels in some of the strip pit ponds. When pumping stopped, the strip ponds refilled. Due to the variable and unpredictable nature of the hydrology in the area,[6]

4. The water level is over the top of the No. 6 seam by about ninety (90) feet, which means if the No. 7 seam is exposed and mined, water will flow into and flood the surface mine. AMAX proposed to lower the water head by about forty (40) feet, which in turn would lower the water pressure in the No. 6 seam by about seventeen pounds per square inch (17 psi).

5. The trial judge based his conclusion on the extensive testimony and exhibits presented to Administrative Law Judge William Teeguarden during the spring of 1990. One hearing required twenty-four full days. In brief, the evidence showed that while the water that had flooded the mines gave a slight buoyant effect to the overlying rock and soil (overburden), there was no way percolating water in a flooded mine five to eight feet high could support eighty to one-hundred fifty feet of overburden. In other words, rock does not float. In addition, the evidence showed that the flooding not only weakened the remaining coal supports, but actually accelerated the rate at which the remaining coal deteriorated. The original coal in place was found to have a strength of about 2200 psi. The water at most provided a pressure of about 38 psi.

6. Like the Sullivan County area in the AMAX case, the Clay County area in the B & LS case has been mined by both surface and under-

the only way that B & LS could avoid the possibility of lowering water levels in the strip pit ponds outside their permit area was to discontinue mining.

When B & LS's permit was approved (July 15, 1988) the Department took the position that I–SMCRA preserved state water rights and that it had no authority to require a surface mine operator to avoid dewatering. The Department's position was that *Wiggins v. Brazil Coal & Clay* (1983), Ind., 452 N.E.2d 958, still controlled common law water rights in Indiana.[7]

In May of 1991, following its decision against AMAX Coal, the Department issued an order which unilaterally altered B & LS's previously issued permit stating that "if temporary or permanent lowering of water bodies causes damage it will be contrary to [the Department's] interpretation of I–SMCRA." R. Vol. I, p. (f)(5), *State ex rel B & LS Contracting, Inc. and Shand Mining v. Indiana Department of Natural Resources et al.* The order required B & LS to either demonstrate a right of entry for off-site lakes to be lowered or to demonstrate by hydrogeologic analysis that surface and groundwater mining operations would not cause off site "damage." The practical effect of the order was to prohibit further mining until B & LS purchased the rights to partially or completely dewater strip ponds outside their permit area that may be affected by its operations.

The trial judge found that, in effect, the Department sought to transfer B & LS's existing common law water rights to nearby property owners whose strip pit ponds might be affected by B & LS's operations, and then require B & LS to repurchase these rights if they were to be able to mine their property. The trial judge noted that there was no basis in law for preferring the use of percolating water by landowners near the Hornet Mine for strip pit ponds, as opposed to B & LS's proposed pumping of percolating water which appeared on its property and interfered with the mining operation. The trial judge stated that B & LS merely sought to make the same use of its property (mining coal), that the nearby landowners (or their predecessor's in interest) already had made of their property (which resulted in the creation of the strip pit ponds). He then concluded that, as a matter of law, the Department had no authority to issue its order and granted B & LS's requests for declaratory judgment, injunction, judicial review, and writ of prohibition.

### DECISION

The parties raise numerous issues and sub issues for our review which we summarize as whether I–SMCRA preserves Indiana water rights law and denies the Department the authority to affect such rights in any way. In addition, as did this court in *AMAX Coal Company v. Adams et al* (1992), Ind.App., 597 N.E.2d 350, we

---

ground methods for years and is no longer in its natural state. Therefore, the hydrogeology is unpredictable.

7. In *Wiggins,* property owners of a strip pit lake sought to prevent Brazil Coal Corp. from dewatering an active strip mine because the dewatering drained their strip pit lake. Our supreme court affirmed the trial court's denial of injunctive relief and damages against Brazil Coal, reversing this court's decision [*Wiggins v. Brazil Coal & Clay* (1982), Ind.App., 440 N.E.2d 495] which "had modified case law by adopting the Restatement (Second) Torts provisions for determining liability in the users of groundwater." *Wiggins, supra* at 960. Our supreme court found that:

Water which percolates away underground through porous earth from beneath one lot to surrounding lands, *no longer belongs to the*

*owner of the lot.* Such water is regarded as *lost water* and is considered at any given time to be part of the land with which it mingles. Groundwater is a part of the land in which it is present and *belongs to the owner of that land. Id.* at 963–964 (emphasis added).

The court then stated:

There is no evidence that defendant's strip mining work was being done with a purpose or intent to injure plaintiffs.... The water was being pumped from the wells for the singular purpose of preventing the water already percolating through and invading defendant's land from reaching and flooding the new pit.... The loss of water from appellant's strip pit was not part of a scheme to bring about injury and was not merely gratuitous. On the basis urged the conclusion of law arrived at by the trial judge was not contrary to law.

*Id.*

raise *sua sponte* the question of whether cross-condemnation by counsel for AMAX and Jarrett is appropriate material for appellate briefs.

## ISSUE I. THE BRIEFING WAR

We first address the quality of briefing by counsels in the AMAX v. Jarrett portion of this case. Apparently, counsels are involved in a series of cases involving surface coal mining in Sullivan County. Their relationship is acrimonious, to put it mildly. Throughout their briefs, and the motions which preceded the briefs, they have launched rhetorical broadsides at each other which have nothing to do with this case. Snide remarks, one even aimed at this court,[8] and personal attacks concerning each other's motivation, intellectual skills, and honesty merely take up valuable judicial time and quite frankly, are boring. As stated by Judge Conover, "such petulant grousing has a deleterious effect" on the subject matter of the brief. *AMAX Coal v. Adams et al., supra* at 352. It is nothing but noise which blocks out legitimate argument. *Id.*

In addition, the Record in this case indicates that such conduct has been the norm, not the exception. Administrative Law Judge William Teeguarden, at the close of a long, bickering filled, 19th day of a 24 day hearing, had this to say to counsel:

> We are going to pick up at 8:30 on Thursday morning in this room. And I am going to see if I can get a room for Friday, Saturday and Sunday. *And this crap is going to stop* and we are going to finish this hearing and we are going to get this behind us and then we are going to go on to wherever it goes next.

Supplemental Record, Transcript of Temporary Relief Hearing, Day 19, p. 331.

We understand Judge Teeguarden's frustration and agree with him (but not necessarily with his choice of words). We also note that our supreme court has recently rejected a petition to transfer for "impertinent allegations" in *Deitch v. Linderman* (1992), Ind.App., 584 N.E.2d 1126, *reh'g denied.* Counsels should be aware that if this kind of behavior continues, they risk rejection of their briefs and the possible loss of their client's case.

## ISSUE II. I–SMCRA AND COMMON LAW WATER RIGHTS

### A. Standard of Review

Although B & LS involves a question of declaratory and injunctive relief and AMAX involves partial summary judgment, the issue before us in both cases is a pure question of law: Whether I–SMCRA gives the Department the authority to change in any way existing Indiana common law water rights. *See* B & LS Record p. 88. We review *de novo* the legal conclusions of the trial court. *Humana Health Care Plans v. Snyder–Gilbert* (1992), Ind.App., 596 N.E.2d 299, 300; *Brant v. Hester* (1991), Ind.App., 569 N.E.2d 748, 754. "Appellate courts independently, and without the slightest deference to trial court determinations, evaluate those issues they deem to be questions of law." *4A* Kenneth M. Stroud *Indiana Practice* section 12.3 (2d ed. 1990). "A *pure* question of law is one that requires neither reference to extrinsic evidence, the drawing of inferences therefrom, nor the consideration of credibility questions for its resolution." *Id.*

### B. Indiana's Common Law of Ground Water

Indiana's common law of percolating ground water[9] is founded on the English Rule, also known as the Absolute Ownership Rule, in that it is not "governed by the law which applies to rivers and flowing streams but ... it rather falls within the principle which gives the owner of the soil all that lies beneath his surface...." *New*

---

8. This resulted in an Order instructing counsel involved to read page 503, paragraph 4, Indiana Rules of Court (West 1992) before filing any further motions or petitions with this court.

9. Subsurface waters, which without any permanent, distinct, or definite channel, percolating in mere veins, ooze or filter from the lands of one owner to the lands of another. *Gagnon v. French Lick Springs Hotel Co.* (1904), 163 Ind. 687, 72 N.E. 849 citing *Miller v. Black Rock Springs Imp. Co.* (1901), 99 Va. 747, 40 S.E. 27.

*Albany and Salem R.R. v. Peterson* (1860), 14 Ind. 112, 114.

A second rule, the American Rule, also recognizes the property interest of the surface owner in the water beneath the land. Under this Rule, a landowner may appropriate such water, but cannot appropriate those waters "in excess of a reasonable and beneficial use upon the lands he owns, unconnected with the beneficial use of the land, especially if the exercise of such use is injurious to others, who have substantial rights to the water." *Metropolitan Utilities Dist. v. Merritt Beach Co.* (1966), 179 Neb. 783, 140 N.W.2d 626, 637.

A liberal form of the American Rule was approved in Indiana at the turn of the century in *Gagnon v. French Lick Springs Hotel Co.* (1904), 163 Ind. 687, 72 N.E. 849. The hotel company owned a number of mineral springs that were a major attraction for the hotel. George Gagnon, conspiring with others whose business interests were hostile to the hotel, drove a well into the aquifer [10] which supplied the springs and placed a powerful steam pump into operation. *Id.* at 693, 72 N.E. at 850. The pump was run continuously withdrawing more than 500,000 gallons of water per day. This caused the springs at the hotel to cease flowing, rendering them practically useless. Neither Gagnon nor his cohorts had any use for the water they pumped, it was simply dumped into French Lick Creek and wasted. *Id.* The hotel owners sought and were granted an injunction against the pumping. On appeal, our supreme court affirmed the trial court. The supreme court followed both the Virginia and Minnesota courts finding that there were well recognized exceptions to both the English and American Rules. "Where the diversion of the water is purely malicious, and is detrimental to another proprietor, it may be prevented by injunction; *Miller, supra;* [also] where the water is simply wasted. *Stillwater v. Farmer* (1903) 89 Minn. 58, 93 N.W. 907." *Id.* 163 Ind. at 696, 72 N.E. at 851.

Given the outrageous conduct of Gagnon, the outcome of this case was not surprising. However, *dicta* in the opinion suggested a major divergence in Indiana from prior common law. The court stated that "there are well-recognized exceptions to [the English and American] rules, and doubtless further exceptions and departures from them will from time to time be found necessary and expedient." *Id.* The court further observed that the "strong trend" was "toward a qualification of the earlier doctrine that the landowner could exercise unlimited and irresponsible control over subterranean waters on his own land, with regard to the injuries which might thereby result to the lands of other proprietors in the neighborhood." *Id.* at 696–697, 72 N.E. at 852. This language was so pointed that in 1956, one commentator declared that "the older view [of ground water rights] was all but abrogated by *Gagnon.*" Note, *Water Rights in Indiana,* 31 Ind.L.J. 39, 47 (1956). However, more recent cases have reaffirmed the traditional Indiana common law view of ground water.

In *Irving Materials v. Carmody* (1982), Ind.App., 436 N.E.2d 1163, property owners were denied compensation for damages to their water wells caused by the pumping of water from a gravel pit. Use of the land as a gravel pit was found to be reasonable and therefore, lawful. The damage suffered by the plaintiffs was found to be *"damnum absque injuria.* They simply have not suffered a legal wrong." *Id.* at 1165.

■ The Indiana Supreme Court reaffirmed the traditional common-law ground water utilization doctrine in *Wiggins v. Brazil Coal & Clay* (1983), Ind., 452 N.E.2d 958, discussed *supra,* n. 7. In addition, the court implicitly rejected the position taken by this court [*Wiggins v. Brazil Coal & Clay* (1982), Ind.App., 440 N.E.2d 495] which had adopted the view of the Restatement (Second) of Torts, Section 858,

---

**10.** Aquifer: Stratum or zone below the surface of the earth capable of producing water as from a well.

Dictionary of Geological Terms, American Geological Institute, Doubleday & Company Inc., Garden City, New York (1962).

by vacating our decision.[11] This has been noted by a federal district court applying Indiana law. "The fact that the Supreme Court of Indiana vacated the decision of the Court of Appeals which attempted to change the law to adopt Section 858 is proof that it decided the issue of the Restatement's relevance to Indiana law." *Prohosky v. Prudential Ins. Co. of America* (N.D.Ind.1984), 584 F.Supp. 1337, 1341.[12] The design and direction of our supreme court in *Wiggins* was unambiguous. Where a person uses or disposes of percolating ground water for a beneficial purpose, damage which results to another is not actionable at common law unless the damage is deliberate or gratuitous. *Wiggins, supra* at 963.

## C.  F–SMCRA AND I–SMCRA

The Surface Mining Control and Reclamation Act of 1977 (Federal SMCRA or F–SMCRA) was a pervasive federal enactment that addressed surface coal mining and developed independently from the Indiana common law of water rights. F–SMCRA required states to adopt regulations that mirrored the federal provisions. If a state failed to do so, a federal plan would be imposed. 30 U.S.C.A. Section 1254; *Hodel v. Indiana* (1981), 452 U.S. 314, 319–20, 101 S.Ct. 2376, 2380–81, 69 L.Ed.2d 40. The Office of Surface Mining, acting through the Secretary of the Interior, approved Indiana's version of SMCRA (I–SMCRA) effective July 29, 1982. The primary statutory authority is I.C. 13–4.1 (The Reclamation Act) and the primary rule authority is found at 310 I.A.C. 12. It is important to note, as this court did in *Indiana DNR v. Krantz Bros. Const.* (1991), Ind.App., 581 N.E.2d 935, *reh'g denied* (1992), that because the first purpose of I–SMCRA "is to implement and enforce [F–SMCRA] ... we will look to [F–SMCRA] and the federal rules adopted under it as we analyze [I–SMCRA]...." *Id.* at 937.

Section 717(a) of both F and I–SMCRA is the subject of this case. Section 717(a) states:

Nothing in this chapter [Article] shall be construed as affecting in any way the right of any person to enforce or protect under applicable law his [the person's] interest in water resources affected by surface coal mining operations [30 U.S.C. section 1307(a) and I.C. 13–4.1–8–1(25)]. (Portions in brackets are contained in I–SMCRA).

As simple as this single sentence appears, it has resulted in fifteen years of interpretation and litigation. From 1977 to 1985, the Department of Interior maintained that section 717(a) in F–SMCRA *did not require* deference to state water rights law. Upon legal challenge, the Department of Interior reversed its position and found that section 717(a) *required* deference to and *did not affect* state water rights law.[13] The D.C. Circuit court upheld the decision of the district court holding that:

The most reasonable interpretation of the statutory language [717(a)] is that whatever water rights State law affords mine operators are preserved along with

11.  § 858 states:
(1) A proprietor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless:
(a) the withdrawal of ground water unreasonably causes harm to a proprietor of neighboring land through lowering the water table or reducing artesian pressure,
(b) the withdrawal of ground water exceeds the proprietor's reasonable share of the annual supply or total store of ground water, or
(c) the withdrawal of the ground water has a direct and substantial effect upon a watercourse or lake and unreasonably causes harm to a person entitled to the use of its water.

Restatement (Second) of Torts, § 858 (1981).

12.  However, the district court issued a limited permanent injunction against the spraying of water which appeared to be wasted (about 2% of the total amount). The 7th Circuit reversed this part of the district court's decision based on *Wiggins*. *Prohosky v. Prudential Ins. Co. of America* (7th Cir.1985), 767 F.2d 387.

13.  In *In re: Permanent Surface Mining Regulation Litigation II, Round III* (1985), D.D.C. 620 F.Supp. 1519, the Secretary of the Interior filed an affidavit stating that "the Secretary agrees Sec. 717(a) requires deference to State water law on questions of water use...." The district court sustained this position. *Id.* at 1525.

those of other users. Under such a reading [SMCRA] does not deprive anyone, including mine operators, of whatever rights to the use of water they had previously. The saving provision by its terms applies to "any person." Congress could easily have excluded mine operators had it intended. [However], throughout SMCRA, *Congress expressed a concern for preserving existing property rights, and for not interfering with State determination of those rights.* (Emphasis added).

*National Wildlife Federation v. Hodel* (1988), D.C.Cir., 839 F.2d 694, 756–757.

Indiana followed both the district and circuit court decisions. The General Assembly first amended I–SMCRA in 1986 to parrot F–SMCRA. In 1989, the Department amended 310 I.A.C. 12–5–29 to recognize that Indiana water rights law was to be unaffected by I–SMCRA. In 1991, the Secretary of the Interior approved this amendment stating:

> [T]he Secretary agrees that section 717(a) requires a deference to State water law on questions of water use and thus interprets section 717(b) and the rule at issue as not requiring the replacement of water supplies to the extent a surface coal mine operator consumes or legitimately uses the water supply under a senior water right determined under applicable law.... Therefore, *Indiana's proposal to subjugate its I–SMCRA-based water rights and replacement provisions to Indiana water rights law is consistent with SMCRA and the Federal regulations.*" (Emphasis added).

56 F.Reg. at 37013.

At the B & LS hearing before the trial court (June 13, 1991), the transcript shows the following exchange:

> TRIAL COURT: Was there anything, any case that came down or decision that was rendered or anything that happened between May 18, 1988, when you said, here's the go-ahead [to surface mine],

and when the [Department] changed its position and said now we no longer believe this amendment means what we thought it meant in 1988? Did something happen between those dates?
>
> COUNSEL FOR THE DEPARTMENT: Nothing happened legally. I think that there was probably discussion internally as to the best way to prevent damage from mining....

Supplemental Record, *B & LS v. Indiana Department of Natural Resources, et al,* at 98–99.

> TRIAL COURT: What I need to know, and apparently what you're saying now is, none of those legal precedents ever changed and the [Department's] position changed.
>
> COUNSEL FOR THE DEPARTMENT: Well, that's true. There were no other cases that came down for the [Department] to say—oh look, here's another *Wiggins* case and it goes this way instead of that way. No, that's true. That didn't happen, but ...

*Id.* at 100.

With this in mind, we now move to the specific cases before us. We address B & LS first simply for convenience.

### D. B & LS and I–SMCRA

■ Although the similarity between the facts in B & LS's case and *Wiggins* is striking, the Department argues that *Wiggins* does not control and that under state water legislation other than I–SMCRA, it has the authority to regulate water resources use in all situations despite the clear mandate of section 717(a).[14]

The Department's position was discussed at the hearing before the trial judge with the following results:

> COUNSEL FOR THE DEPARTMENT: ... I think the General Assembly has evidenced its desire to maybe go beyond *Wiggins* because there has been legisla-

---

**14.** I.C. 13–2–2–1 *et seq.* Water Rights—Ground Water. The Department calls our attention to I.C. 13–2–2–2, the Declaration of Policy. We in turn refer the Department to I.C. 13–2–2–1 where "[t]he term 'ground water,' as used in this chapter, shall mean all water filling the *natural openings* under the earth's surface including all underground streams, artesian basins, reservoirs, lakes, and other bodies of water below the earth's surface." (Emphasis added).

tion since then trying to protect wells, trying to protect lakes ... and so ... and so they're kind of expanding some kind of protection. What we go to is ... that's right. *Wiggins* is not the only water rights law and the legislature has evidenced this intention to afford protection to citizens. And so we go to Indiana Code 13-2-2 and this is where I say that I am repeating myself ... where it is stated that water is a resource, a valuable resource of the state and it can be regulated. And yes, we do go back to SMCRA on that and say, that is reasonable regulation in the surface mining context.

TRIAL COURT: Does that strike you at all as bootstrapping?

COUNSEL FOR THE DEPARTMENT: Yes.

TRIAL COURT: Okay. That's honest. All right. I've just pretty well chopped up your argument.

*Id.* at 107–108.

As stated *supra,* the trial judge then found that the Department had exceeded its statutory authority. He noted that our General Assembly in 1986 amended I–SMCRA so that F–SMCRA section 717(a) was repeated verbatim and which expressly limits and prohibits all provisions of the "Article" from "affecting in any way" water rights. R. at 6, paragraph 15 citing to AMAX Judgment paragraphs 7 through 15. "The only reasonable interpretation of I.C. 13-4.1-8-1(25) is that I–SMCRA expressly preserves and does not affect [B & LS's] common law water rights. Thus, [the Department's] Order is unlawful and in excess of its jurisdiction and authority." R. at 7.

Regarding I.C. 13-2-2-2, the trial judge found that there is nothing in this section that authorizes or grants any authority to the Department to affect B & LS's groundwater rights. In addition, the type of "ground water" in this case is not covered by the statute—a strip pit pond or lake is not a natural body of water. B & LS merely seeks to make the same use of their property that the present owners of the strip pit lake (or their predecessor's in interest) made of their property—to surface mine coal.

We agree with the trial judge. *Wiggins* still controls the common law of percolating ground water rights in Indiana. As a matter of law, the Department has no authority to interfere with B & LS's non-malicious or gratuitous use of "lost water" on their land. The design and direction of our supreme court in *Wiggins* is unambiguous. Where a person uses or disposes of percolating ground water for a beneficial purpose, damage which results to another is not actionable at common law unless the damage is deliberate or gratuitous. *Wiggins supra,* at 963.

### E. AMAX Coal, Jarrett, and I–SMCRA

Apparently recognizing the correctness of the trial court's decision in regard to section 717(a), Jarrett tried a different attack and argued that "an Indiana property owner has an absolute right to subjacent support of his property which is superior to any right of a neighboring property owner to depressurize an abandoned underground mine underlying both properties by pumping ground water from the mine." Jarrett's Brief at 12. Jarrett then attempted to extend this concept to include the absolute right of lateral support. Jarrett urged us to adopt Sections 818[15] and 820[16] of the

**15.** § 818 states:
One who is privileged to withdraw subterranean water, oil, minerals or other substance from under the land of another is not for that reason privileged to cause a subsidence of the other's land by the withdrawal.
Comment b to § 818 states:
The right of the surface owner to lateral and subjacent support of his land *in its natural state* is paramount and the privilege of withdrawal does not in itself serve as a defense to the strict liability stated in §§ 817 and 820.

Restatement (Second) of Torts § 818 (1977).

**16.** § 820 states:
(1) One who withdraws the naturally necessary subjacent support of land in another's possession or the support that has been substituted for the naturally necessary support is subject to liability for a subsidence of the land of the other that was naturally dependent upon the support withdrawn.

Restatement (Second) of Torts to prevent AMAX from lowering the water head in the No. 6 coal which he concludes is now "subjacent support" for his land. Jarrett ignores the fact that these theories of law apply to land in its natural state.

■ The trial judge found that pre-I-SMCRA water rights law as set forth in *Wiggins* was that ground water escaping from one landowner to the land of another is "lost water" as to the former. The escaping water that appeared in AMAX's pit was part of AMAX's land and belonged to AMAX. The rights to use ground water flowed with the ground water. Under Indiana water rights law, there was and is no obligation of lateral support placed upon land owners to prevent the escape of ground water from other lands. *See Wiggins, supra* at 964; *Spall v. Janota* (1980), Ind.App., 406 N.E.2d 378.

■ Indiana water rights law, as affirmed by *Wiggins*, does not depend on, nor change due to, the nature of the ground water use by a landowner before the water escapes (i.e., a use as so-called "substituted support" or a use to fill an abandoned strip pit and form a lake), or upon secondary effects occasioned by the escape of the ground water, (i.e., the lost use for "support" or the lost use to fill a pit and form a lake).

The "use" which Jarrett seeks to protect is to use the groundwater as supposed "substituted support" to replace the natural support removed during mining in the Regent and Vandalia Mines pursuant to mining rights conveyances. Such a "use" has no priority under Indiana water law and there is no basis in law to require lateral support for water, i.e., to prevent the escape of ground water. Nothing under Indiana law would allow a landowner whose predecessors have sold rights, including the removal of natural support, to replace such rights by limiting the rights of others or by placing on others new or additional lateral support duties.

Even under the law of lateral support pursuant to Restatement (Second) section 818, a landowner cannot artificially enlarge his rights to support by altering the natural condition of his land so as to create or place an additional duty of lateral support upon adjoining landowners. The undisputed facts are that seventy-five to eighty percent (75–80%) of the natural subjacent support was removed by underground mining in the No. 6 coal seam. The subsequent flooding of the abandoned mines by percolating ground water further decreased the strength of the remaining natural support—the remaining twenty to twenty five percent (20 to 25%) of the coal (pillars).[17] Percolating ground water that flooded the abandoned mines, cannot, and did not, replace the "naturally necessary support." Jarrett's theory of "subjacent support" by percolating ground water flooding abandoned mines is unsupported by science, law, or logic. Therefore, lacking such necessary support—like the old mines in the No. 6 coal—Jarrett's theory collapses.

The Department and Jarrett would have us construe I–SMCRA so as to: (1) appropriate AMAX's water rights to replace the natural necessary support that was removed by underground mining allowed by Jarrett's predecessors; and (2) require lateral support of percolating ground water by AMAX—all for the benefit of Jarrett. This we decline to do. AMAX's pumping of ground water in order to prevent such water from invading and flooding its surface coal mine pit is a valid business purpose (Administrative Law Judge Finding 315, affirmed by the Department) and is a lawful exercise of its pre- and post-I-SMCRA ground water rights.

The trial court is affirmed.

CONOVER and RUCKER, JJ., concur.

---

(2) One who is liable under the rule stated in subsection (1) is also liable for harm to artificial additions that result from a subsidence.
Restatement (Second) of Torts § 820 (1977).

**17.** In other words, twenty to twenty-five percent (20–25%) of the original coal is now carrying 100% of the load—i.e., the weight of the overburden.